David A. DITTRICK and Darlene
Dittrick, Petitioners,

v.

James CHALFANT, Respondent.

C.A. No. 2156–VCL.

Court of Chancery of Delaware,
Sussex County.

Submitted: April 3, 2007.
Decided: April 4, 2007.

David J. Weidman, Esquire, Hudson, Jones, Jaywork & Fisher, LLC, Georgetown, DE, for the Petitioners.

Kashif I. Chowdhry, Esquire, Moore & Rutt, P.A., Georgetown, DE, for the Respondent.

## OPINION

LAMB, Vice Chancellor.

The purchasers of a home under an installment land sale contract bring this action against the seller for specific performance of the parties' written agreement. Although the agreement is incomplete in so much as it fails to expressly provide for an interest rate term, it is nonetheless specifically enforceable against the seller because the omitted term is not an essential element of an installment land sale contract and because the missing term is supplied by statute. Therefore, the court will enter an order requiring the seller to perform his contractual obligation as provided below.

I.

A. *The Parties*

The petitioners, David and Darlene Dittrick, are the purchasers under an installment land sale contract relating to a residence located at 11822 Sandy Ridge Drive, Laurel, Delaware. The respondent, James Chalfant, is the record owner of the property and the seller under the contract at issue.

B. *The Facts*[1]

Dittrick[2] and Chalfant worked together for over a decade as truck drivers for the Yellow Freight Company in Pennsylvania. In 2002, Chalfant moved to Laurel, Delaware. As retirement approached, the Dittricks decided to explore the idea of relocating from Baltimore, Maryland to Delaware. In January 2003, the Dittricks came to spend the weekend with Chalfant and his wife in Laurel. Over the course of that visit, Dittrick expressed to Chalfant his interest in relocating to Delaware. As luck would have it, Chalfant owned a house in Laurel, located at 11822 Sandy Ridge Drive, that had been listed for sale for some time at $99,900, but had generated little serious interest from prospective purchasers.

The Dittricks returned to Delaware in February 2003 to see the house. They met with Chalfant, who quoted a price of $80,000 in conversation with Dittrick. No understanding was reached. After re-

---

1. These are the facts as the court finds them following trial in this matter.

2. Hereinafter, "Dittrick" refers to David Dittrick.

turning home, Dittrick enlisted the help of a friend with experience in real estate valuation. This friend accompanied Dittrick to the Sandy Ridge property and told him that $80,000 was a reasonable and fair price. About a week later, the Dittricks telephoned Chalfant and agreed to purchase the property for $80,000, with a $3,000 down payment. Sometime in mid-March, before closing took place, the Dittricks moved into the Sandy Ridge property.

In early 2003, the Dittricks did not have the financial resources to purchase the home either by paying cash or by borrowing the purchase price. Dittrick was recently divorced, and, as he told Chalfant, his ex-wife "had killed his credit." The Dittricks' plan was to use a retirement annuity as collateral to secure the necessary financing, but they would not be able to access that annuity for any purpose until some period of time after David retired.

The Sandy Ridge property was subject to a mortgage in favor of Green Tree Financial that secured a note bearing interest at the high rate of 11.75%.[3] In February 2003, the remaining principal amount of the underlying note was approximately $76,600. Chalfant mentioned this mortgage to Dittrick in the course of their discussions, but never furnished him with copies of the note, the mortgage, or any related documents. Chalfant testified that Dittrick agreed to take over paying the Green Tree mortgage until he was able to obtain replacement financing. Both Dittricks contradicted this testimony, claiming that they did not agree to assume the Green Tree mortgage and would never have agreed to pay such a high rate of interest to purchase the house. In fact, Dittrick, who owned homes in Pennsylvania and mortgaged each of them, testified that he never had a discussion with Chalfant about any rate of interest whatsoever.

Chalfant undertook to have the agreement reduced to writing. For that purpose, he met with Everett Moore, Esquire of Moore & Rutt, P.A. in Georgetown, Delaware. Chalfant testified that he told Moore the terms of his agreement with the Dittricks and Moore recommended that the parties execute a written installment land sale contract. Chalfant retained Moore for that purpose and relied on him to draft an agreement correctly. One of Moore's associates or employees then prepared a draft agreement and sent it to Chalfant. Chalfant read the draft but made no changes or comments. Chalfant and the Dittricks met on April 1, 2003 in Moore's offices and executed the agreement.[4] The parties' dispute is predicated on the patent deficiencies and ambiguities of that contract.[5]

---

3. The original mortgagee was Conseco Finance. Green Tree purchased Conseco in the summer of 2003.

4. Such an agreement typically contemplates that the buyer will make specified periodic payments to the seller in order to pay the purchase price of the property. The seller retains title until the purchase price is paid, but must deliver title to the buyer when the balance is paid in full.

5. As will be discussed later, and as readily admitted by trial counsel from Moore & Rutt at the trial, the written agreement fails to reflect Chalfant's version of the parties' agreement and, thus, falls short of what Chalfant was entitled to expect of his attorneys. In light of this, the court expressed concern over the fact that the Moore & Rutt firm was representing Chalfant in this litigation. In response, the Moore & Rutt firm represented to the court that (1) Chalfant is not being charged for their services in representing him in this litigation, (2) the firm has agreed to make Chalfant whole in the event judgment is entered against him, and (3) the firm's liability insurer is aware of the situation and does not object to the firm's representation of Chalfant in this matter. Surprisingly, trial

The most obvious deficiencies in the written contract are the following:

1. Paragraph 2 states the purchase price as $77,000, not $80,000. That paragraph also omits mention of any down payments made by the Dittricks.

2. Paragraph 2 further requires the Dittricks to make a payment of $800 at closing and then applies that entire payment against the balance of the purchase price (reducing it to $76,200). The remainder of paragraph 2 then requires monthly $800 payments to Chalfant.

3. The contract does not mention the existing mortgage or obligate the Dittricks to assume its performance.

4. The contract does not state a rate of interest.

5. Paragraph 3 provides that the Dittricks shall have the privilege of prepaying in part or in full the principal amount "together with accrued interest" at any time, without penalty.

6. The contract states that when the Dittricks have paid the $77,000 purchase price in full, Chalfant shall deliver a good and sufficient deed conveying the Sandy Ridge property by a good and marketable title that is fee simple and free and clear of all liens and encumbrances.

7. The contract at paragraph 4.2 contains a draconian forfeiture clause in the event of any "default and termination," giving Chalfant the option to retain all payments made by the Dittricks under the contract as "liquidated damages."

The contract also requires the Dittricks to pay taxes and insurance on the property, and they have done so.[6]

For several years, the parties more or less adhered to the basic provisions of the April 2003 contract. One slight discrepancy arose a few months after the April 1, 2003 closing, but did not, at that time, lead to any disagreement. After the Dittricks made several monthly payments to Chalfant, Chalfant gave them his mortgage payment information and asked them to make the payments directly to Green Tree. From that point forward, the Dittricks remitted $825.93 per month to Green Tree.[7] Of each payment, $44.50 represents insurance on the property. The remaining $781.43 is the amount of one of Chalfant's monthly mortgage payments. After this dispute arose in December 2005, the Dittricks reverted to the strict terms of the written contract, paying $800 per month directly to Chalfant.

Although they maintain that they have never been responsible for making the mortgage payments, the Dittricks took the mortgage interest deduction relating to the Green Tree mortgage on their federal income tax returns from 2003 to 2005. This practice began when Chalfant handed Dittrick the 2003 form 1099 from Green Tree and suggested that the Dittricks take the deduction since they were making the payments. Before taking this step, the Dittricks consulted with their tax adviser and were given the go ahead.

counsel also told the court that the agreement between Moore & Rutt and Chalfant regarding this litigation is not in writing.

6. Following the execution of the contract, the Dittricks also made substantial improvements to the property. The underneath siding of the home was removed and replaced with cement blocks, the interior walls were stripped and repainted, and window sills were installed in all the windows.

7. Since the agreement was executed, the Dittricks made 48 monthly installment payments.

In late 2005, David's annuity payments began and the Dittricks were able to use this cash flow to obtain a commitment for a loan at 6% interest to be secured by the Sandy Ridge property. The Dittricks planned to use the proceeds of that loan to pay off the balance remaining on their contract with Chalfant. The Dittricks believed this to be a wise course of action due to their concern that if they fell behind on their payments, Chalfant had the right to terminate the contract, retain their prior payments as liquidated damages, and eject them from the property.

In November 2005, the Dittricks contacted a title company in Bridgeville, Delaware to make preparations for the settlement of the installment land sale contract and the transfer of title. The Dittricks discovered that there was a $5,000 prepayment penalty on the underlying mortgage with Green Tree and alerted Chalfant of this development. Chalfant called Green Tree and learned that the penalty only applied for five years following the initiation of his mortgage, and that if settlement was delayed until December 2005, the penalty would no longer apply. The parties agreed to schedule the settlement for the first week in December to avoid this penalty.

The Dittricks again contacted the title company to determine exactly what both parties needed to bring to the December settlement. Besides the remaining $51,400 the Dittricks believed they owed Chalfant under the contract and their share of the closing costs,[8] the Dittricks were told that Chalfant needed to bring an additional $26,000 to closing in order to extinguish the Green Tree mortgage. When the Dittricks told Chalfant this news, he flatly refused to close, contending that the Dittricks were obligated to pay off the Green Tree loan as a part of the purchase price. The Dittricks then filed this action for specific performance of the installment land sale contract as they understand its terms. Trial was held on March 7, 2007.

## II.

The parties to this litigation have never argued that they did not intend to enter into a contract for the sale of the Sandy Ridge property in 2003. Rather, they dispute the proper construction of the written agreement they signed to memorialize their deal. The Dittricks contend that the terms of the contract are plain on their face and, accordingly, the court should enforce them. Specifically, paragraph 2 of the contract provides for an initial purchase price of $77,000 and for monthly payments of $800, every dollar of which is to be applied to reduce the balance of the purchase price. Paragraph 2.3 and paragraph 5 allow the Dittricks, so they say, to tender the remaining amount due under the contract at any time and to demand in exchange the simultaneous delivery of good and marketable title to the property, free and clear of all existing liens and encumbrances. Because neither a particular interest rate nor the assumption of the Green Tree mortgage is mentioned within the four corners of the contract, the Dittricks claim they are unambiguously entitled to an interest-free, seller-financed purchase of the property. Furthermore, even if the terms of the contract are ambiguous, all of its provisions should be strictly construed against Chalfant because he, through his counsel, drafted the agreement.

Chalfant counters that the April 2003 contract is an incomplete embodiment of

8. Darlene Dittrick testified that the original amount of the loan they applied for was $53,000. Typical closing costs paid to the title company likely account for any discrepancy between the two figures.

the parties' oral understanding. He claims extrinsic evidence establishes that the Dittricks were aware of the Green Tree mortgage throughout the preliminary negotiations and orally agreed to assume it. Although patently ambiguous, Chalfant says the written contract was intended to correspond as closely as possible to the balance owed to Green Tree in April 2003, and part of this mutual understanding was that the installment land sale contract included an 11.75% interest rate on the principal. According to Chalfant, the fact that the Dittricks took mortgage interest deductions on their income taxes amply illustrates the true intentions of the parties when they executed the contract. Finally, Chalfant argues that by taking this deduction while simultaneously maintaining to the court that the contract involved payments for principal only, the Dittricks have acted with unclean hands and are equitably barred from enforcing the agreement.

## III.

A. *The Contract Is Ambiguous And Contradictory With Respect To An Interest Rate And The Legal Rate of Interest Must Apply*

 Pursuant to the widely accepted "objective theory" of contract interpretation—a framework adopted and followed in Delaware—the court must interpret a contract in a manner that satisfies the "reasonable expectations of the parties at the time they entered into the contract."[9] Standing in the shoes of an objectively reasonable third-party observer, if the court finds that the terms and language of the agreement are unmistakably clear, the court should look only to the words of the contract to determine its meaning and the parties' intent.[10] Thus, if the contract is unambiguous, the court must not consider parol or extrinsic evidence to accomplish this straightforward task.[11]

 If, however, a reasonable third party would be unable to determine the meaning of certain contractual provisions, the agreement is considered ambiguous.[12] Though ambiguity takes many forms, it generally exists "if the terms of the contract are inconsistent, or when there is a reasonable difference of opinion as to the meaning of words or phrases."[13] In that case, extrinsic evidence is an appropriate resource for the court to use in determining the parties' reasonable intentions at the time of the contract.[14] Sources of such evidence include "overt statements and acts of the parties, the business context [of the contract], prior dealings between parties, business custom, and usage in the industry."[15]

 Even the most cursory reading of the contract at issue here reveals that the document is both patently ambiguous and incomplete with respect to an interest rate term. Paragraph 2 states a purchase price of $77,000, an amount then reduced to $76,200 because of an $800 payment upon the contract's execution. Paragraph

9. *The Liquor Exchange, Inc. v. Tsaganos*, 2004 WL 2694912, at *2 (Del.Ch. Nov. 16, 2004).

10. *Id.* (citing *E.I. Du Pont de Nemours & Co. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997)).

11. *Id.* (citing *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

12. *Id.*

13. *Id.* (citing *Mell v. New Castle County*, 2004 WL 1790140, at *3 (Del.Super.Aug. 4, 2004)).

14. *Id.* (citing *Eagle Indus.*, 702 A.2d at 1232).

15. *Id.* (citing *Supermex Trading Co., Ltd. v. Strategic Solutions Group*, 1998 WL 229530, at *3 (Del.Ch. May 1, 1998)).

5 provides that title should pass as soon as the $77,000 is paid "in full." On the other hand, paragraph 2.3 speaks to prepayment of both "principal" and "accrued interest." Likewise, paragraph 2.4 discusses late charge calculations on monthly installments of "principal and interest." The obvious question raised by these written terms is whether the required monthly $800 payments are applied entirely against the remaining balance of the purchase price or, instead, include both interest and principal. The contract's passing reference to the accrual of interest suggests one answer, but the purchase price language can be read as providing that monthly payments apply dollar-for-dollar against the principal balance. More puzzlingly, if interest has in fact "accrued," at what rate did it do so? The contract simply does not supply answers to these questions in any objectively reasonable way.

Arriving at the obvious determination that ambiguity exists in the April 2003 contract merely frames the interpretative problem for the court, it does not resolve it. Fortunately, an examination of the most salient evidence in this case reveals what the parties' reasonable expectations must have been at the time the contract was signed—namely, that some provision for interest was intended.

 For several reasons, the court concludes that the Dittricks understood that some interest rate would apply. Dittrick testified that he had experience in borrowing money and had taken out loans for, and paid interest on, other purchases of real property in the past.[16] He also readily admitted that the purchase price provided in the contract was a correct estimate of the Sandy Ridge property's fair market value. In the circumstances, the court reasonably infers from the evidence that the Dittricks, who understood the time value of money, also understood that Chalfant was not proposing to finance a fair value sale of the property himself. Moreover, no prior relationship existed between the parties to suggest that Chalfant meant to extend zero-interest terms as a gratuity or as past consideration. In ordinary business dealings, even those involving unsophisticated parties, the old adage still applies: there is no such thing as a free lunch.

 It is equally improbable, however, that the Dittricks agreed to assume Chalfant's mortgage at a rate of 11.75%. The Dittricks both testified that they would not have signed the contract with such a high rate of interest.[17] Their testimony is supported by the fact that only a couple of years later they were able to obtain financing for the property at 6%. Moreover, the record reflects both that Chalfant did not give Dittrick a copy of the Green Tree note or mortgage and that the note and mortgage are not mentioned in the contract. That the Dittricks remitted payment directly to Green Tree beginning a few months after the contract was signed and even later claimed interest deductions on their taxes does not alter this analysis

---

**16.** To the extent Dittrick testified that his prior experience with market forces and interest did not enter his thought processes when the parties executed the contract, the court finds that testimony self-serving and lacking in credibility.

**17.** This testimony is intrinsically buttressed by the punitive nature of an installment land sale contract. For a reasonable person to agree to transfer an interest rate on an underlying mortgage—an arrangement where the mortgagor builds up equity and is protected by certain rights of redemption—to a contract such as the agreement here—where the buyer forfeits his entire interest in the property upon missing a payment—does not make economically rational sense. All else equal, one would expect to encounter a lower rate of interest when immediate forfeiture upon default is a distinct possibility.

for the simple reason that Chalfant himself suggested they do so.[18] They remitted payment to Green Tree directly as an accommodation to Chalfant and claimed the deduction only after he gave Dittrick the form 1099 and told him he should do so.

 This leaves the issue of what rate of interest to supply. Fortunately, the missing interest rate is supplied by statute, 6 *Del. C.* § 2301(a), which provides, in pertinent part, that "[w]here there is no expressed contract rate, the legal rate of interest shall be 5% over the Federal Reserve discount rate." At the time of the contract, the discount rate was 2.25%.[19] Therefore, the legal rate of interest which will apply to the April 2003 agreement is 7.25%.

B. *The Interest Rate Provision In An Installment Land Sale Contract Is Not An Essential Term And Specific Performance Is Warranted*

 Having determined that the legal rate of interest on April 1, 2003 applies

to the contract, the court must now decide what relief is appropriate. The relief requested by the Dittricks—specific performance—is an extraordinary remedy. To succeed in an action for specific performance in a case such as this, a petitioner must show by clear and convincing evidence that there is "a valid contract to purchase real property and that [he is] ready, willing, and able to perform [his] obligations under the contract."[20] The balance of the equities also must favor the party seeking relief.[21] Furthermore, specific performance will not be granted when "the court has to supply ... essential terms of the contract."[22] But while the parties themselves must agree on the essential terms, "a court will not upset an agreement where [an] indefinite provision is not an essential term."[23]

 Specific performance is warranted here for several reasons. First, even assuming that an interest rate provision in an installment land sale contract is essen-

---

18. Chalfant's unclean hands defense relating to the tax deductions is of no moment for this same reason: he told the Dittricks to claim the deduction. This court has consistently refused to apply the doctrine of unclean hands to bar an otherwise valid claim of relief where the doctrine would work an inequitable result. *See, e.g., Cole v. Kershaw,* 2000 WL 1206672, at *4 (Del.Ch. Aug.15, 2000). For the doctrine to apply, there must be some sort of fraud or sharp practice on the part of the litigant against whom the defense is offered. DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 11-6[b], at 11-62 (2005). The Dittricks' reliance on their tax adviser and on Chalfant's representations support the court's conclusion that this required element of unscrupulous practices and overreaching is not satisfied in this case.

19. Minutes of the Federal Reserve Board of Governors Meeting on March 31, 2003, *at* http://www.federalreserve.gov/Boarddocs/Press/Monetary/2003/20030703/attachment.pdf. *See In re GM (Hughes) S'holder Litig.,*

897 A.2d 162, 170 (Del.2006) ("The trial court may also take judicial notice of matters that are not subject to reasonable dispute."); *see also* D.R.E. 201(b) (providing that "a judicially noticed fact must be one not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

20. *Walton v. Beale,* 2006 WL 265489, at * 3 (Del.Ch. Jan.30, 2006) (citing *Peden v. Gray,* 886 A.2d 1278 (Del.2005)).

21. *Id.* (citing *Word v. Johnson,* 2005 WL 2899684, at *3 (Del.Ch. Oct.28, 2005)).

22. *Id.* (citing *Mehiel v. Solo Cup Co.,* 2005 WL 1252348, at *7 (Del.Ch. May 13, 2005)).

23. *Id.* at *5 (citing *River Enters., LLC v. Tamari Props., LLC,* 2005 WL 356823, at *1 (Del.Ch. Feb.15, 2005)). *See also* POMEROY, SPECIFIC PERFORMANCE OF CONTRACTS § 145, at 378–79 (3d ed. 1926) ("When a contract has

tial, the court is not supplementing the agreement through its own judicial discretion. Rather, the law, through 6 *Del. C.* § 2301(a), is supplying the interest term. Therefore, a judicial determination that an agreement is incomplete should not, by itself, make specific performance unavailable when a statute directly addresses, and stands ready to supply, a missing or ambiguous term.

Second, standing alone, the interest rate provision in an installment land sale contract would not appear to be an essential term of the agreement. While no Delaware law exists on whether or not an interest term in such a contract is essential, the courts of at least one other state have directly addressed the issue. In *Real Flo Properties v. Kelly*,[24] the plaintiff instituted action on a landlord's complaint to remove the defendant from the premises. The defendant counterclaimed, seeking a declaration that an installment land sale contract, rather than a lease, existed, as well as an order requiring the plaintiff to furnish a statement of the principal and interest credited against the purchase price of the property.[25]

The court below adopted the magistrate's order, which supplied an interest rate on the original purchase price and

determined that the defendant had paid $9,800 towards the principal balance since the inception of the contract.[26] The Ohio Court of Appeals affirmed, holding that, despite the absence of an interest rate, there were sufficient terms to form an enforceable contract for sale. The agreement contained a date of execution, the address of the property, the total purchase price, the amount of the down payment, the principal still owed after application of the down payment, the amount of the installment payment, a statement requiring the seller to deliver a warranty deed, and a statement as to responsibility for taxes.[27] All of these same terms are indisputably present in the contract at issue in this case.

While *Real Flo* did not involve an action for specific performance, the clear import of the court's holding is that such relief would have been granted had the defendant so requested. Indeed, the magistrate's order, which the trial court adopted and the appellate court affirmed, required the plaintiff "to convey the property to [the defendant] upon full payment of the purchase price."[28] The *Real Flo* decision, then, counsels that specific performance is an appropriate remedy for an aggrieved purchaser despite the absence of an express interest rate provision because the

been partly performed by a plaintiff, and the defendant has received and enjoys the benefits thereof, and the plaintiff would be virtually remediless unless the contract were enforced, the court, from the plainest considerations of equity and common justice, does not regard with favor any objections raised by the defendant merely on the ground of the incompleteness or uncertainty of the agreement. Even if the agreement be incomplete, the court will then, in furtherance of justice and to prevent a most inequitable result, decree a performance of its terms as far as possible...").

24. 1999 WL 1203751, 1999 Ohio App. Lexis 6030 (Ohio Ct.App. Dec. 17, 1999).

25. *Id.* at *1, 1999 Ohio App. Lexis 6030 at *3.

26. *Id.* at *1, 1999 Ohio App. Lexis 6030 at *3–4.

27. *Id.* at *2, 1999 Ohio App. Lexis 6030 at *8. The contract in *Real Flo* explicitly listed a purchase price ($19,000) and recited that an initial payment was made ($1,200) upon execution of the agreement. The contract then stipulated that the remaining purchase price was $17,800. *Id.* *1, 1999 Ohio App. Lexis 6030 at *2. Thus, striking similarities exist between the contract in *Real Flo* and the one at issue here.

28. *Id.* at *1, 1999 Ohio App. Lexis 6030 at *4.

interest rate is not an essential term of an installment land sale contract.[29]

Finally, the balance of the equities favors the Dittricks and supports their request for specific performance. Since inhabiting the Sandy Ridge property, the Dittricks have made substantial improvements thereon and have performed a sizable portion of the April 2003 contract. They undertook these tasks with the expectation that they were well on their way to owning their home. Denying the Dittricks the opportunity to specifically perform the contract here would work an inequitable forfeiture of their reasonable expectations and interests.[30] Thus, specific performance is merited on the facts of this case.

## IV.

Pursuant to the foregoing, the court specifically finds as follows: (1) As recited in paragraph 2.2 of the contract, the principal indebtedness as of April 1, 2003 was $76,200; (2) to date, the Dittricks have made 48 payments of $781.43 toward satisfaction of the contract; (3) the contract carried an interest rate of 7.25%; (4) the contract term was for 147 months;[31] (5) to date, the Dittricks have paid $17,815.85 in principal and $19,692.79 in interest and thus have an outstanding principal balance of $58,384.15 under the contract. Upon receipt of this amount, Chalfant is hereby ordered to deliver to the Dittricks a good and sufficient deed conveying the Sandy Ridge property in fee simple, free and clear of all liens and encumbrances, as provided in paragraph 5 of the contract.[32] IT IS SO ORDERED.

**29.** *See also Eckart v. Engelking Corp.*, 2006 WL 2729301 (Minn.App. Sept. 26, 2006) (holding that the parties' failure to specify an interest rate in a contract for the sale of real property was "not fatal" and affirming the district court's decision to apply the statutory rate of interest to the agreement); *Silverstreak, Inc. v. Parsons*, 112 Wash.App. 1039, 2002 WL 1505760 (Div. 1 July 15, 2002) (suggesting that the failure of the parties to include a rate of interest would not necessarily preclude specific performance, but not specifically deciding the question because many other terms of the contract were also missing); *Genest v. John Glenn Corp.*, 298 Or. 723, 696 P.2d 1058, 1080–82 (1985) (Campbell, J., dissenting) (arguing that the legal rate of interest should apply to a real estate contract and that "in a close case . . . part performance and lack of another remedy by the buyer" should tip the scales in favor of specific performance in a contract to sell land); 11 WILLISTON ON CONTRACTS § 1424, at 813 (3d ed. 1968) ("The law does not favor, but leans against the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if that can be ascertained. . . . It is generally held that uncertainty in the terms of payment is a de-

fect in an essential rather than a subordinate provision; however, where the contract contains no provision as to rate of interest, it will be presumed that the legal rate was intended."). *But see Homler v. Malas*, 229 Ga.App. 390, 494 S.E.2d 18, 20 (1997) (holding that the "interest rate is an essential term to enable the courts to enforce [a contract for the sale of real property] between buyer and seller").

**30.** *See, e.g., Jefferson Chem. Co. v. Mobay Chem. Co.*, 267 A.2d 635, 636 (Del.Ch.1970) ("Equity, of course, abhors a forfeiture. And it is not obliged to permit a party to get the advantages which a forfeiture would give him. It will disregard a forfeiture occasioned by failure to comply with the very letter of an agreement when it has been substantially performed.").

**31.** When principal, payment amount, number of payments per year, and the interest rate are present, one simply solves for the number of payment periods needed to zero out the loan.

**32.** It is the court's express understanding and purpose that the entire difference between the payoff amount of the Green Tree note and

$58,384.15 shall be paid by the firm of Moore & Rutt, in accordance with its agreement to hold its client, Chalfant, harmless for its negligence.