# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SOUTHPAW CREDIT OPPORTUNITY MASTER FUND, L.P. and CLOUDYBLUFF & CO., in its capacity as the nominee of NORTHEAST INVESTORS TRUST,<br><br>Plaintiffs,<br><br>v.<br><br>ROMA RESTAURANT HOLDINGS, INC., a Delaware corporation, SCOTT WILSON, and KENNETH J. REIMER, PH.D.,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 2017-0059-TMR |

## MEMORANDUM OPINION

Date Submitted: January 4, 2018
Date Decided: February 1, 2018

Martin S. Lessner, James P. Hughes, Tammy L. Mercer, and Richard J. Thomas, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; *Attorneys for Plaintiffs.*

Kevin G. Abrams, John M. Seaman, and E. Wade Houston, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Attorneys for Defendants Scott Wilson and Kenneth F. Reimer, Ph.D.*

Brock E. Czeschin and Anthony M. Calvano, RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Nominal Defendant Roma Restaurant Holdings, Inc.*

**MONTGOMERY-REEVES, Vice Chancellor.**

This case comes before me pursuant to 8 *Del. C.* § 225 to determine the proper composition of the board of Roma Restaurant Holdings, Inc. ("Roma" or the "Company"). In a letter opinion dated October 13, 2017 (the "Pre-Trial Letter Opinion"), I recalled the Delaware Supreme Court's guidance that "[i]n determining what claims are cognizable in a [Section] 225 action, the most important question that must be answered is whether the claims, if meritorious, would help the court decide the proper composition of the corporation's board."[1] In order to properly name Roma's board, I must determine the stockholders entitled to vote.

Prior to November 2016, two investment funds held large minority stakes in the Company. The first fund had an employee and an ally on the three-person Roma board. But on November 30, 2016, the second fund arranged the purchase of a sufficient number of shares to become a majority owner of outstanding Roma stock. Immediately thereafter, the Roma board members rushed to create and enact an employee compensation plan that issued enough restricted stock to effectively dilute the second fund back down to a minority position. In addition to the entrenchment concerns raised by defendants' actions, the restricted stock issuance suffered from multiple problems, including the Company's failure to

---

[1] Pre-Trial Letter Op. 9 (alterations in original) (quoting *Genger v. TR Inv'rs, LLC*, 26 A.3d 180, 199 (Del. 2011)).

obtain contractually mandated joinder documents from each recipient before the issuance. Though all parties in this litigation agree that the stock issuance is invalid, plaintiffs argue that the issuance is void, while defendants aver that the issuance is voidable and may be ratified under the common law. Following trial, I conclude that the challenged stock issuance is void, and cannot be counted in a vote, because the board failed to obtain the required joinder before issuing the stock.

## I.  BACKGROUND

Prior writings from the Court detail the many twists and turns of this case.[2] Because I now examine the narrow question of whether the challenged stock issuance is void or voidable, I provide only a review of the facts surrounding that issuance and the events that ensued.

The facts in this opinion are my findings based on the parties' stipulations and 569 trial exhibits, including deposition transcripts. I grant the evidence the weight and credibility that I find it deserves. [3]

---

[2]   *See, e.g.*, Order Granting Defs.' Mot. to Dismiss (May 30, 2017) (dismissing this action—momentarily—after Director Defendants declined to defend their own position on the eve of trial); Pre-Trial Letter Op. (finding need for this trial to prevent Director Defendants from engaging in gamesmanship by asserting claims in a purportedly new action).

[3]   After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr." No disrespect is intended. Joint trial exhibits are cited as "JX #." Unless otherwise indicated, citations to the parties' briefs are to pre-trial briefs for the trial held on November 21, 2017.

## A. Roma Reorganizes

Roma, the parent company of restaurant chains Tony Roma's and TR Fire Grill, filed for bankruptcy in 2005.[4] In March 2006, holders of Roma's senior class of notes exchanged their debt instruments for common stock pursuant to the court-approved reorganization plan.[5] Among those receiving stock in the reorganized Company were Southpaw Credit Opportunity Master Fund L.P. ("Southpaw"), Northeast Investors Trust ("Northeast"), and Highland Capital Management, L.P. ("Highland").[6] Southpaw and Cloudybluff & Co, in its capacity as the nominee of Northeast, are Plaintiffs in the current action. Defendants are Scott Wilson, a managing director at Highland, and Kenneth J. Reimer, each of whom were Roma directors during the events leading up to this case (Wilson and Reimer collectively, the "Director Defendants"). Roma is the nominal Defendant in the action.

The reorganization bound all stockholders to a governing agreement (the "Stockholders' Agreement").[7] Section 5.2 of the Stockholders' Agreement bars Roma from "issu[ing] any shares of capital stock or any Common Stock

---

[4]     Defs.' Answering Br. 5.

[5]     JX 556, at 9-10.

[6]     Defs.' Answering Br. 5.

[7]     JX 4.

3

Equivalents to any Person not a party to [the Stockholders'] Agreement, unless such Person has agreed in writing to be bound by the terms and conditions of this Agreement pursuant to an instrument substantially in the form attached hereto as Exhibit C-2."[8] Furthermore, failure to execute proper joinders to the Stockholders' Agreement before issuance makes "[a]ny issuance of Shares or any Common Stock Equivalents by the Company . . . null and void *ab initio*."[9]

On March 27, 2006, Roma adopted an incentive plan (the "2006 Plan") to compensate key employees as part of the reorganization.[10] The 2006 Plan empowered the board to issue options and restricted stock for a period of ten years.[11] During the decade that followed, Roma's troubled performance placed the stock options issued under the 2006 Plan deeply underwater.[12] The 2006 Plan expired on March 27, 2016.[13]

Despite the fact that no plan was in place by the end of March 2016, the Roma board did not pursue a new plan with haste. Instead, the board explored

---

[8]     JX 4, § 5.2.

[9]     *Id.*

[10]    JX 6.

[11]    *Id.* § 2.1.

[12]    Indeed, only two employees ever exercised options from the 2006 Plan. Defs.' Answering Br. 10.

[13]    JX 6, § 10.

various avenues for a new incentive plan at meetings on July 27, 2016[14] and October 19, 2016.[15] The Company consistently emphasized two points in its considerations. First, the board wanted stock options with a cashless exercise,[16] so that, unlike under the 2006 Plan, employees would actually receive valuable compensation through the new plan. Second, the board's deliberations highlighted the importance of receiving stockholder approval for any new plan involving options, as required by the Stockholders' Agreement.[17]

## B.    Southpaw Acquires Additional Stock

By October 7, 2016, Southpaw and Northeast held a combined 48.8% of outstanding Roma stock.[18] On November 30, 2016, Southpaw negotiated the purchase of the 2.5% stake held by Kenneth Myres,[19] Roma's former president and CEO, which would bring Plaintiffs' ownership to 51.4%. The existing Roma board—composed of Wilson, Reimer, and Steven Judge, the Company's CEO at

---

[14]    JX 51.

[15]    JX 96.

[16]    *See, e.g.*, JX 41.

[17]    For example, Roma asked outside counsel for a draft of a possible new incentive plan on May 16, 2016, but noted that the Company did not "need the shareholders' approval documents at this time." JX 39. Similarly, on September 21, 2016, Roma's counsel stated that the board's "next step would be to decide how many shares to load the plan with and then seek stockholder approval." JX 87.

[18]    JX 161.

[19]    JX 188.

the time—received an email from Daniel Cronk, Roma's counsel, at 2:07 p.m. on November 30 that notified them that Myres "is selling the shares to Southpaw, and . . . the sale has not yet occurred."[20]  In response, Wilson called Myres to inform him that the sale would cause other directors to "come in and replace [Wilson] and [Reimer] on the board,"[21] and Highland would "take any action possible to stop it."[22]

Around 6:27 p.m. on November 30, 2016, a Southpaw representative called Cronk to make clear that it was not Southpaw's "intention to 'shake things up' following the Myres transaction."[23]  Eight minutes after Cronk informed the board of that phone call, Wilson sent a spreadsheet to Roma's outside counsel detailing specific award amounts to employees under a new compensation plan.[24]  At trial, Wilson testified that he could not recall who created the spreadsheet or when the board discussed the specific award allocations listed.[25]  Reimer testified that he

---

[20]    JX 189.

[21]    JX 524.1, at 52.

[22]    JX 535.  Wilson was a Highland employee and Reimer a Highland ally.

[23]    JX 206.

[24]    JX 240.

[25]    JX 527, at 185-86.

6

could not recall having reviewed any such allocations.[26] Judge testified that Wilson generated the allocations, but that Judge did not know how Wilson chose the specific numbers.[27]

The new plan (the "2016 Plan") provided for the issuance of restricted stock and did not require stockholder approval before the issuance of the restricted stock.[28] The plan issued 32,000 shares of restricted stock to Judge, 3,000 to Brian Grusi, Roma's CFO, and a total of 13,500 to twelve other Roma employees.[29] This total of 48,500 shares of restricted stock constituted 8.5% of the total outstanding Roma stock, sufficient to dilute Southpaw and Highland from 51.4% following the Myres transaction to 46.9%.

Outside counsel advised the board to "consult[] with the Company's accountants to determine the financial impact of the cancellation [of stock options under the 2006 Plan] and new grant [of restricted stock because] . . . [they] may have negative accounting consequences to the Company."[30] Instead of taking that advice, the board proceeded to hold a telephonic board meeting to approve the new

---

[26]     JX 526, at 63.

[27]     JX 529, at 141.

[28]     JX 202, § 6.1(a).   The 2016 Plan also mentioned, but required stockholder approval before, the issuance of stock options. *Id.*

[29]     JX 325.

[30]     JX 232.

7

plan on December 1, 2016. Wilson testified that he could not recall whether the December 1 meeting to approve the 2016 Plan was related to Southpaw's new majority position.[31] While trying to schedule the meeting, Reimer told the other board members and counsel, "I have a meeting in the a.m. that I can't cancel [at] this point, but will cancel the lunch meeting to get on this."[32] Despite this, Wilson testified that the board meeting occurred in the morning.[33] Judge, who was traveling overseas at the time, testified that he was "jet lagged [and] tired"[34] and had to leave his hotel room in Spain in order to find better phone reception because the call "kept cutting in and out."[35] The board approved the 2016 Plan at this December 1 telephonic meeting.[36] Roma did not produce any notice, agenda, or minutes for this board meeting during the pendency of this litigation.[37]

On the night of December 1, 2016, Roma employees received an email notifying them of their awards of restricted stock.[38] Director Defendants do not

---

[31]    JX 527, at 63-66.

[32]    JX 232.

[33]    JX 527, at 35.

[34]    JX 529, at 98.

[35]    *Id.* at 147-148.

[36]    JX 527, at 34.

[37]    JX 524.

[38]    JX 211.

contest that the Company failed to obtain executed joinder forms from the Roma employees receiving restricted stock under the 2016 Plan, despite the requirements of Section 5.2 of the Stockholders' Agreement.[39] By 10:23 p.m. on that same day, Grusi told Judge and Cronk that the recipients of the restricted stock had questions about the value of the award; Grusi offered to "take a stab at valuation" but noted that "it would be biased which is why independent is best."[40] Judge explained that the Company did not seek an independent valuation of the restricted stock before approving the 2016 Plan.[41] Houlihan Lokey valued Highland's stake in Roma, but Wilson refused to share that valuation despite Judge's request for it.[42]

Plaintiffs, Judge, Grusi, and Cronk held a phone call on December 6, 2016 to discuss Southpaw's acquisition of Myres's stake.[43] On that call, Southpaw stated that it would seek to obtain board representation through its ownership stake.[44] No one on the Roma side mentioned that the Company had just issued restricted stock

---

[39]    Defs.' Answering Br. 46.

[40]    JX 222.

[41]    JX 529, at 169.  Roma did retain an external valuation company, CBIZ, on December 10, 2016.  JX 287.  But the board viewed the value produced by CBIZ as too high and took steps to lower it.  JX 334.

[42]    JX 529, at 169-171.

[43]    *Id.* at 174.

[44]    *Id.* at 175-76.

9

under a new incentive plan, diluting Southpaw's stake to a minority position.[45]  On

December 9, 2016, Roma issued a stock certificate to Southpaw that reflected the

transfer of Myres's stock,[46] but Roma did not deliver the stock certificate until

December 21, 2016.  Finally, on December 22, 2016, the Roma board informed

stockholders of the new 2016 Plan.[47]

On December 30, 2016, Southpaw delivered a written consent to Roma that

purported to remove Wilson and Reimer from the board and appoint Howard

Golden and Bradley Scher.  Roma refused to honor the consents, and Southpaw

filed suit on January 25, 2017.

## C.    This Litigation

What followed was a protracted battle over written consents.  The Complaint

asserted that the issuances under the 2016 Plan are invalid and void, or at the least

voidable,[48] and thus, Golden and Scher are proper board members.[49]  The parties

submitted—and the Court approved—a case schedule and a status quo order.  Trial

---

[45]     *Id.* at 176.

[46]     JX 531, at 61.

[47]     JX 325.

[48]     Compl.  ¶ 82.

[49]     *Id.* ¶¶ 5, 43.

was scheduled for May 25, 2017. The parties conducted discovery, which included fourteen days of depositions in four states.[50]

On May 12, 2017, Director Defendants filed a pre-trial brief and stated that they "will not assert at trial that [issuances under the 2016 Plan are] . . . valid."[51] At the pre-trial conference on May 18, Director Defendants argued that "it's [not] necessary to go to trial to litigate . . . any issue regarding validity of [the issuances under the 2016 Plan]."[52] Director Defendants explained that although they were "not conceding that [the issuances under the 2016 Plan are] invalid, . . . we don't want them. . . . We don't want the plan to remain in existence."[53] Instead, Director Defendants claimed that while there were technical issues with Plaintiffs' written consents, Director Defendants would allow Plaintiffs to "take action to correct [the] defective written consents,"[54] which would moot the Southpaw Action.

In response, Plaintiffs pleaded with me to find the issuances under the 2016 Plan invalid so that the Defendants could not later claim that those shares were

---

[50]    Pre-Trial Tr. 39 (May 18, 2017).

[51]    Defs.' Pre-Trial Br. 4 (May 12, 2017).

[52]    Pre-Trial Tr. 36 (May 18, 2017).

[53]    *Id.* at 35.

[54]    *Id.*

11

voted to remove or elect directors.[55]  In support of this request, Plaintiffs pointed me to *Infinity Investors Ltd. v. Takefman*.[56]  In *Infinity*, "the individual defendants admit[ted] that they [were] no longer directors,"[57] but refused to acknowledge the validity of the stock conversion that brought about their removal from the board.[58] The Court noted that "dismiss[ing] this claim merely because the defendants purported to resign after their removal, while allowing them to question the validity of the conversion and subsequent election . . . would reward gamesmanship."[59]  Instead, "[a]s equity looks to the intent rather than to the form, this Court should not permit parties to manipulate procedural rules for the purpose of avoiding resolution on the merits."[60]  The Court then held that the defendants' refusal to defend the conversion was an admission that the conversion was invalid, and they could not contest the issue in later cases.[61]

I asked counsel for Defendant Directors at that hearing whether we were in

---

[55]     *Id.* at 13-31.

[56]     2000 WL 130622 (Del. Ch. Jan. 28, 2000).

[57]     *Id.* at *4.

[58]     *Id.* at *4-5.

[59]     *Id.* at *5.

[60]     *Id.*

[61]     *Id.*

12

an *Infinity* situation.[62]  In response, counsel assured me that this was not the same as *Infinity*, because there "you had two directors . . . who conceded the seats but wanted to continue the challenge . . . .  We don't think that's what we're doing."[63] Counsel urged me not to rule on the validity of the restricted stock issued under the 2016 Plan due to potential negative ramifications for the employees to whom stock was issued.[64]  Relying on the representations made to me, I lifted the stay to allow a new written consent to address the technical issues raised by Director Defendants.

On May 19, 2017, Plaintiffs submitted new written consents, which Roma and Director Defendants accepted.  Thereafter, on May 30, 2016, the Court entered an order (1) recognizing Plaintiffs' nominees as proper board members, (2) dismissing the action as moot, and (3) retaining jurisdiction to resolve a fee application.

On July 21, 2017, less than two months later, Director Defendants' counsel filed a complaint on behalf of Highland, where one of the Director Defendants is a managing director, to determine the composition of the Roma board pursuant to 8 *Del. C.* § 225.  Highland claimed that, in addition to voting its own shares, certain

---

[62]     Pre-Trial Tr. 44 (May 18, 2017).

[63]     *Id.* at 45.

[64]     *Id.* at 37.

13

Roma employees had validly voted shares issued under the 2016 Plan to place Director Defendants back on the Company board (the "Highland Action"). Determining the proper board composition in the Highland Action also would have required me to determine the stock eligible to vote. In the Highland Action, Highland sought to argue that the Roma board had ratified the contested stock issued under the 2016 Plan.[65] Recognizing that the Court would have to determine whether the stock is void or voidable before proceeding to the common law ratification question, Plaintiffs and the Company asked me to proceed in the Southpaw Action—in which the parties were fully prepared for trial scheduled for May 25, 2017—to first determine whether the stock is void or voidable.

In the Pre-Trial Letter Opinion from October 13, 2017, I found that Director Defendants had engaged in gamesmanship and ordered the parties to move to trial in the current action to determine whether the challenged stock is void or voidable, before incurring additional litigation and discovery costs in Highland's newly filed action.[66] On October 18, 2017, as part of trial preparation, Plaintiffs asked Director Defendants if Director Defendants intended to defend the validity of the 2016 Plan at trial. On October 31, 2017, Plaintiffs sent the Court a letter noting that Director Defendants still would not commit to either defending or not

---

[65]      Oral Arg. Tr. 140.

[66]      Pre-Trial Letter Op. 12.

14

defending the validity of the 2016 Plan at trial. On November 3, 2017, Director Defendants informed the Court that they would not defend the 2016 Plan as validly enacted. The Court held trial on November 21, 2017,[67] at which Director Defendants argued that the restricted stock issued pursuant to the 2016 Plan is voidable because of Director Defendants' own actions, but not void.[68]

## II. ANALYSIS

The parties request a determination of the proper composition of the Roma board under 8 *Del. C.* § 225, which, in this case, requires an examination of whether the stock issuance pursuant to the 2016 Plan is void or voidable. On the one hand, under Delaware law, a corporate action is void where it violates a statute or a governing instrument such as the certificate of incorporation or the bylaws.[69] On the other hand, a corporate action "taken in violation of equitable principles is voidable, not void, because '[o]nly voidable acts are susceptible to . . . equitable

---

[67] The parties sent additional submissions to the Court on January 3 and 4, 2018.

[68] Defs.' Answering Br. 1.

[69] *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1046 n.70 (Del. 2014) (quoting *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1077-78 (Del. Ch. 2004), *aff'd sub nom*, *Black v. Hollinger Int'l, Inc.*, 872 A.2d 559 (Del. 2005)); s*ee, e.g.*, *Waggoner v. Laster*, 581 A.2d 1127, 1137 (Del. 1990) (holding that action in violation of the certificate of incorporation is void); *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5739680, at *20 (Del. Ch. Oct. 11, 2013), *aff'd*, 106 A.3d 1035 (noting that action in violation of the bylaws is void).

defenses.'"[70]  Regarding stock issuances in particular, "if the stock is void, then cancellation is the proper remedy," whereas "if the stock is voidable then a [c]ourt may grant that form of relief that is to be most in accord with all of the equities of the case."[71]

Plaintiffs argue that the stock issuance is void because it violated the Stockholders' Agreement and Delaware statutory law, as well as breached Director Defendants' fiduciary duties.[72]  Defendants respond that the issuance is not void as it complied with the Stockholders' Agreement and statutory law.  Defendants add that fiduciary duties are equitable in nature and, thus, stock issued in violation of fiduciary duties is voidable as opposed to void.  Following trial, I conclude that the

---

[70]    *Klaassen*, 106 A.3d at 1046 (quoting *Boris v. Schaheen*, 2013 WL 6331287, at *15 (Del. Ch. Dec. 2, 2013)).

[71]    *Byrne v. Lord*, 1996 WL 361503, at *4 (Del. Ch. June 11, 1996) (quoting *STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1137 (Del. 1991)) (internal quotation marks omitted).

[72]    Plaintiffs contend that "[m]uch like certificates of incorporation and bylaws, the Stockholders' Agreement, to which Roma is bound as a party, sets forth the rights of Roma's stockholders and defines the scope of the Board's powers and duties." Pls.' Opening Br. 9.  Thus, according to Plaintiffs, the Stockholders' Agreement here is a governing instrument.  *Id.* at 9-10.  Plaintiffs argue that violations of various provisions of the Stockholders' Agreement render the issuances void under Delaware case law and the express terms of the Stockholders' Agreement. Defendants do not contest that the Stockholders' Agreement here operates as a governing instrument or that a stock issuance found to be in violation of the Stockholders' Agreement would be void.  "Issues not briefed are deemed waived." *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999).  As a result, I do not analyze whether stock issued in violation of contractual obligations is void or voidable under Delaware case law.

16

restricted stock issuance is void for failure to comply with the joinder requirement in the Stockholders' Agreement; thus, the stock issued under the 2016 Plan may not be counted in a vote to determine the composition of the Roma board.[73]

## A. The Stock Issuances are Void

Plaintiffs argue that the issuances under the 2016 Plan are void, instead of voidable, for contravening the Stockholders' Agreement. Director Defendants concede "that the 2016 [Plan] is voidable, but . . . contend that it's not void" because the 2016 Plan complies with the Stockholders' Agreement.[74] Thus, I must analyze the express language of the Stockholders' Agreement.

"Delaware law adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party."[75] "When interpreting a contract, [Delaware courts] 'will give priority to the parties' intentions as reflected in the four corners of the agreement,' construing the agreement as a whole and giving effect to all its provisions."[76] The terms of the contract control "when they establish the parties' common meaning so

---

[73] Because I decide the case on the joinder requirement, I need not address Plaintiffs' additional arguments.

[74] Oral Arg. Tr. 79.

[75] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

[76] *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *GMG Capital Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[77]

The Stockholders' Agreement in the instant case widely controls Roma's activities. For instance, the Stockholders' Agreement dictates restrictions on the transfer or acquisition of stock, rules regarding meetings and the election of directors, and restrictions on board and stockholder actions.[78] Section 5.2 of the Stockholders' Agreement explicitly bars Roma from "issu[ing] any shares of capital stock or any Common Stock Equivalents to any Person not a party to [the Stockholders'] Agreement, unless such Person has agreed in writing to be bound by the terms and conditions of this Agreement pursuant to an instrument substantially in the form attached hereto as Exhibit C-2."[79] The joinder document attached to Exhibit C-2 of the Stockholders' Agreement requires that an individual acknowledge that he or she: (1) was "given a copy of the [Stockholders'] Agreement;" (2) was "afforded ample opportunity to read . . . it;" (3) was "afforded ample opportunity . . . to have counsel review it;" (4) is "thoroughly familiar with" the Stockholders' Agreement; and (5) agrees to be bound by the Stockholders'

---

[77]     *Id.* at 368 (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

[78]     JX 4.

[79]     *Id.* § 5.2.

Agreement.[80]  The Stockholders' Agreement bars the company from issuing stock or stock equivalents to any person "unless such [p]erson has agreed in writing to be bound by the terms and conditions of this [Stockholders'] Agreement pursuant to" a joinder substantially similar to that in Exhibit C-2.[81]  And the joinder in Exhibit C-2 specifies that  "the Company is prohibited from issuing the shares *unless and until*" the recipient acknowledges and agrees to be bound by the terms of the Stockholders' Agreement.[82]  If all of these terms are not met, the issuance is "null and void *ab initio*."[83]

Here, Director Defendants do not contest that the recipients of restricted stock under the 2016 Plan did not agree to be bound by joinders at the time of issuance.[84]  Instead, Director Defendants contend that the award agreements under the 2016 Plan contain language "substantially in the form" of the joinder required by Exhibit C-2 of the Stockholders' Agreement.[85]

---

[80]     *Id.* at Ex. C-2.

[81]     *Id.* § 5.2.

[82]     *Id.* at Ex. C-2 (emphasis added).

[83]     *Id.* § 5.2.

[84]     Defs.' Answering Br. 46.

[85]     *Id.* at 48.

The award agreements sent to recipients of restricted stock under the 2016 Plan, however, state that each recipient "acknowledges and understands that the [restricted stock] issued pursuant to [the 2016 Plan] shall be subject to . . . the terms of the . . . Stockholders['] Agreement."[86] Further, each recipient agrees "to execute any instruments in writing which may be necessary or proper in carrying out the purposes of [the 2016 Plan] or reasonably requested by the Company, including, without limitation, a joinder to the Stockholders['] Agreement."[87]

While the joinder in the award agreement need not be identical to that in Exhibit C-2, it must be substantially similar to the form. Section 10 of the award agreement does not satisfy this requirement. At best, the award agreement contains two relevant terms: (1) an acknowledgement that the stock is subject to the Stockholders' Agreement and (2) an agreement to agree to the terms of *a* joinder, not even necessarily that contained in Exhibit C-2 or one substantially similar to it. The award agreement does not acknowledge that the recipient had the opportunity to read the Stockholders' Agreement and consult with counsel in order to become familiar with the terms as required by the joinder in Exhibit C-2. Nor does the joinder explicitly state that the recipient is bound by the terms of the

---

[86]    JX 205 Ex. B, § 10.

[87]    *Id.*

Stockholders' Agreement. Moreover, the joinder requirement must be satisfied *before* issuance of the restricted stock,[88] which the Company failed to do.

The terms of the Stockholders' Agreement and the joinder in Exhibit C-2 are straightforward, but explicit, from a compliance—and result of noncompliance—standpoint. The Company needed to obtain joinder forms substantially in the form of the joinder in Exhibit C-2 before issuing restricted stock under the 2016 Plan. The rushed nature of Director Defendants' actions likely made it impossible to obtain joinders from each restricted stock recipient before issuance. But that does not excuse noncompliance with the clear and express terms of the Stockholders' Agreement. All recipients of stock and stock equivalents must understand—following the opportunity to read and consult with counsel—the Stockholders' Agreement and then bind themselves to the Stockholders' Agreement at or before issuance to ensure compliance with that agreement. The contractually mandated penalty for failure to comply with this requirement is that the issuance is void *ab initio.* Thus, I apply the outcome dictated by the express terms of the Stockholders' Agreement and find the restricted stock issued pursuant to the 2016 Plan is void.

---

[88] JX 4 Ex. C-2.

## B. The Outcome is Equitable

Director Defendants also contend that finding the restricted stock issuance void *ab initio* is an inequitable outcome because the breach of the Stockholders' Agreement was on technical grounds.[89] I disagree. Director Defendants point to Delaware case law noting that "[e]quity . . . abhors a forfeiture . . . [and so] [i]t will disregard a forfeiture occasioned by failure to comply with the very letter of an agreement when it has been substantially performed."[90] But, as discussed above, the award agreement substantively failed to comply with numerous elements of the joinder provision, including the timing under which the joinders must be completed as well as the requirements that the recipient acknowledge that they had ample time to read and consult with counsel on the Stockholders' Agreement. Director Defendants' failure to satisfy the joinder provision was more than a mere technical deficiency; it was a failure to substantially perform the required actions. Thus, Director Defendants' case law is unavailing.

Moreover, "it is not the job of a court to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not. Rather, it is the court's job to enforce the clear terms of contract."[91] And "[n]either

---

[89] Defs.' Answering Br. 47-50.

[90] *Dittrick v. Chalfant*, 948 A.2d 400, 410 n.30 (Del. Ch. Apr. 4, 2007) (quoting *Jefferson Chem. Co. v. Mobay Chem. Co.*, 267 A.2d 635, 636 (Del. Ch. 1970)).

[91] *DeLucca v. KKat Mgmt., L.L.C.*, 2006 WL 224058, at *2 (Del. Ch. Jan. 23, 2006).

22

logic nor equity compel the validation of a legally void act."[92]  The terms of the Stockholders' Agreement are clear here and dictate finding the issuance void *ab initio*.

Finally, significant evidence suggests that Director Defendants acted with entrenchment motives when adopting the 2016 Plan.  These actions appear to have extended to gamesmanship in front of the Court.[93]  Director Defendants ask the Court to find the restricted stock issued under the 2016 Plan voidable so that it may be argued in the Highland action (or another yet-to-be-filed action) that the Roma board ratified the challenged issuances.[94]  But parties "seeking the aid of equity's extraordinary remedies do so subject to the maxim that he who seeks equity must do equity."[95]  Thus, I find the outcome of this litigation to be equitable under the facts of this case.

---

[92]   *STAAR Surgical*, 588 A.2d at 1137 (citing *Ala. By-Prods. Corp. v. Neal*, 588 A.2d 255, 258 (Del. 1991)).

[93]   Pre-Trial Letter Op. 12 (noting that Director Defendants' waited until the eve of trial before refusing to defend their position in order to moot the case, only to have Wilson's employer file a new suit seeking to vote the stock that Director Defendants' refused to defend as validly issued).

[94]   Oral Arg. Tr. 140.

[95]   *Nevins v. Bryan*, 885 A.2d 233, 248 (Del. Ch. 2005) (quoting *Richard Paul, Inc. v. Union Improvement Co.*, 91 A.2d 49, 54 (Del. Ch. 1952)).

### III. CONCLUSION

For the foregoing reasons, I find the stock issued under the 2016 Plan to be void; thus, that stock cannot be considered in a vote to determine the composition of the Roma board.

**IT IS SO ORDERED**.