# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PPL CORPORATION, PPL CAPITAL FUNDING, INC., PPL ELECTRIC UTILITIES CORPORATION, PPL ENERGY FUNDING CORPORATION, PAUL A. FARR, MARK F. WILTEN, PETER J. SIMONICH, WILLIAM H. SPENCE, RODNEY C. ADKINS, FREDERICK M. BERNTHAL, JOHN W. CONWAY, PHILIP G. COX, STEVEN G. ELLIOTT, LOUISE K. GOESER, STUART E. GRAHAM, STUART HEYDT, RAJA RAJAMANNAR, CRAIG A. ROGERSON, NATICA VON ALTHANN, KEITH H. WILLIAMSON, and ARMANDO ZAGALO DE LIMA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | **C.A. No. 2018-0868-JRS** |
| RIVERSTONE HOLDINGS LLC, TALEN ENERGY CORPORATION, TALEN ENERGY HOLDINGS, INC., TALEN ENERGY SUPPLY, LLC, TALEN MONTANA, LLC, RAVEN POWER HOLDINGS LLC, C/R ENERGY JADE, LLC, and SAPPHIRE POWER HOLDINGS LLC, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: October 4, 2019
Date Decided: October 23, 2019

Paul J. Lockwood, Esquire, Robert A. Weber, Esquire and Nicole A. DiSalvo, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware and George A. Zimmerman, Esquire, Jonathan Frank, Esquire, Tansy Woan, Esquire, Andrew N. Goldman, Esquire and Charles C. Platt, Esquire of Skadden, Arps, Slate, Meagher & Flom, New York, New York, Attorneys for Plaintiffs PPL Corporation, PPL Capital Funding, Inc., PPL Electric Utilities Corporation, PPL Energy Funding Corporation, Mark F. Wilten, Peter J. Simonich, William H. Spence, Rodney C. Adkins, Frederick M. Bernthal, John W. Conway, Philip G. Cox, Steven G. Elliott, Louise K. Goeser, Stuart E. Graham, Stuart Heydt, Raja Rajamannar, Craig A. Rogerson, Natica von Althann, Keith H. Williamson, and Armando Zagalo de Lima.

Thomas G. Macauley, Esquire of Macauley LLC, Wilmington, Delaware and Joshua L. Seifert, Esquire of Joshua L. Seifert PLLC, New York, New York, Attorneys for Plaintiff Paul A. Farr.

Rolin P. Bissell, Esquire and James M. Yoch, Jr., Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware and Michael C. Holmes, Esquire, Melissa L. James, Esquire and Devin L. Kerns, Esquire of Vinson & Elkins LLP, Dallas, Texas, Attorneys for Defendants Riverstone Holdings LLC, Raven Power Holdings LLC, C/R Energy Jade, LLC and Sapphire Power Holdings LLC.

David E. Ross, Esquire and R. Garrett Rice, Esquire of Ross Aronstam & Moritz LLP, Wilmington, Delaware; Karl Stern, Esquire and Kate K. Shih, Esquire of Quinn Emanuel Urquhart & Sullivan, LLP, Houston, Texas; Andrew J. Rossman, Esquire of Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York; and Adam B. Wolfson, Esquire of Quinn Emanuel Urquhart & Sullivan, LLP, Los Angeles, California, Attorneys for Talen Energy Corporation, Talen Energy Holdings, Inc., Talen Energy Supply, LLC, and Talen Montana, LLC.

**SLIGHTS, Vice Chancellor**

Some of the defendants in this case brought a first-filed action in Montana state court against several of the plaintiffs here. The Montana claims share a common nucleus of operative facts with the claims asserted in this Court. It is not surprising, therefore, that Defendants have moved to dismiss or stay this litigation in favor of the Montana litigation under Delaware's well-settled *McWane* doctrine.[1] Whether dismissed or stayed, from Defendants' perspective, the Delaware case must end now.

Borrowing from Coach Lee Corso, Plaintiffs say "not so fast." Acknowledging that *McWane* may appear, at first glance, to be case dispositive, Plaintiffs argue the parties' disputes, and all claims arising from those disputes, trace back to a so-called "Separation Agreement" that contains a mandatory Delaware forum selection clause. Thus, with vigor matching Defendants', they argue *McWane* does not apply and the Delaware claims, at least, must be litigated in this Court as agreed by the parties.

Against this procedural curtain, the Court's task is two-fold. First, the Court must address the applicability and scope of the forum selection clause. This requires a determination of whether the clause binds certain non-parties to the Separation

---

[1] *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.*, 263 A.2d 281 (Del. 1970) (setting forth a multi-factor test to determine if Delaware action should be dismissed or stayed in favor of first-filed litigation pending elsewhere).

Agreement and whether it is broad enough to capture the claims asserted both in Delaware and Montana, including extra-contractual claims. Second, the Court must determine whether Plaintiffs have proffered a reasonable construction of the Separation Agreement and have stated viable claims for relief.

For reasons I explain below, I conclude *McWane* does not apply because all plaintiffs in the Montana litigation, including non-parties to the Separation Agreement, are bound by that agreement's mandatory Delaware forum selection clause. In addition, Plaintiffs have well-pled the Separation Agreement is either directly implicated by the Montana claims or must be construed before the viability of the Montana claims can be determined. Because the parties agreed that only this Court may construe the Separation Agreement, the claims brought here, including claims of breach of the Separation Agreement and related prayers for declaratory judgment, must proceed apace. With that said, Plaintiffs' attempt to plead a breach of the implied covenant of good faith and fair dealing based on Defendants' alleged breach of the Separation Agreement fails as a matter of law. That count in the operative complaint must be dismissed. Finally, Plaintiffs' claim that a non-party to the Separation Agreement tortiously interfered with certain parties' performance of that contract is well-pled and, therefore, must remain.

# I.  BACKGROUND

I have drawn the facts from well-pled allegations in the operative Second Amended Complaint[2] and documents incorporated by reference or integral to that pleading.[3]  For purposes of Defendants' Rule 12(b)(6) motion, as I must, I accept those well-pled facts as true.[4]  Otherwise, when addressing the venue issues under Rule 12(b)(3), I am "not shackled to the plaintiff's complaint" and have considered extrinsic evidence that is properly in the record.[5]

## A. The Parties

Plaintiff, PPL Corporation ("PPL"), is a publicly traded Pennsylvania corporation with its headquarters in Allentown, Pennsylvania.[6]  Through its many subsidiaries, PPL operates regulated utilities throughout the United States and the United Kingdom, delivers natural gas to customers in Kentucky and generates electricity from power plants in Kentucky.[7]

---

[2] Citations to the Second Amended Complaint are to "Compl. ¶ __."

[3] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a Motion to Dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

[4] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006).

[5] *Troy Corp. v. Schoon*, 2007 WL 949441, at *2 (Del. Ch. Mar. 26, 2007).

[6] Compl. ¶ 16.

[7] *Id.*

Plaintiff, PPL Capital Funding, Inc., is a Delaware corporation.[8] It is a subsidiary of PPL that provides financing for other PPL entities.[9]

Plaintiff, PPL Electric Utilities Corporation, is a Pennsylvania corporation.[10] It is a subsidiary of PPL that distributes electricity in Pennsylvania.[11]

Plaintiff, PPL Energy Funding Corporation, is a Pennsylvania corporation.[12] It is a subsidiary of PPL and a former indirect parent of PPL Montana LLC ("PPL Montana").[13]

Plaintiffs, Paul A. Farr, Mark F. Wilten and Peter J. Simonich are former members of PPL Montana's Board of Managers. Plaintiffs, Frederick M. Bernthal, Philip G. Cox, Louise K. Goeser, Stuart E. Graham, Steven G. Elliott, William H. Spence, Rodney C. Adkins, John W. Conway, Stuart Heydt, Raja Rajamannar, Craig A. Rogerson, Natica von Althann, Keith H. Williamson and Armando Zagalo de Lima, are current or former members of PPL's Board of Directors.[14]

---

[8] Compl. ¶ 17.

[9] *Id.*

[10] Compl. ¶ 18.

[11] *Id.*

[12] Compl. ¶ 19.

[13] *Id.*

[14] Compl. ¶¶ 20–23.

Defendant, Riverstone Holdings LLC ("Riverstone"), is a Delaware limited liability company.[15]   Riverstone is a private equity firm with an $80 billion investment portfolio.[16] It has "deep expertise" in the energy industry, with particular experience in managing "large-scale coal mines, power stations and associated infrastructure."[17]

Defendant, Talen Energy Corporation ("Talen"), is a Delaware corporation.[18] Talen is wholly owned and controlled by Riverstone.[19]

Defendant, Talen Energy Holdings, is a Delaware corporation and is a wholly owned subsidiary of Talen.[20]

Defendant, Talen Energy Supply, LLC ("Talen Energy Supply"), is a Delaware LLC and is a wholly owned subsidiary of Talen.[21]   Talen Energy Supply was formerly known as PPL Energy Supply.[22]

---

[15] Compl. ¶ 24.

[16] *Id.*

[17] *Id.*

[18] Compl. ¶ 25.

[19] *Id.*

[20] Compl. ¶ 26.

[21] Compl. ¶ 27.

[22] *Id.*

Defendant, Talen Montana, LLC ("Talen Montana"), is a Delaware LLC and is a wholly owned subsidiary of Talen Energy Supply.[23]   Talen Montana was formerly known as PPL Montana.[24]

Defendant, Raven Power Holdings LLC ("Raven"), is a Delaware LLC.[25] Raven is controlled by Riverstone.[26]

Defendant, C/R Energy Jade, LLC ("Jade"), is a Delaware LLC.[27]   Jade is controlled by Riverstone.[28]

Defendant, Sapphire Power Holdings LLC ("Sapphire"), is a Delaware LLC.[29] Sapphire is also controlled by Riverstone.[30]

## B. The Essence of the Dispute

The disputes between the parties arise from two transactions.   In 2014, PPL Montana sold certain of its hydroelectric assets to an unrelated third-party for

---

[23] Compl. ¶ 28.

[24] *Id.*

[25] Compl. ¶ 29.

[26] *Id.*

[27] Compl. ¶ 30.

[28] *Id.*

[29] Compl. ¶ 31.

[30] *Id.*

$904 million.[31]  The proceeds from that sale were then distributed upstream to various PPL-affiliated entities (the "Distribution").[32]  Defendants have alleged in Montana that the Distribution rendered PPL Montana insolvent.[33]

In 2015, PPL spun off certain of its assets to Talen (the "Spin").[34]  Talen Montana was one of the assets included in the Spin.[35]  Riverstone contributed assets to the Spin, took a 35% interest in the newly created Talen and subsequently acquired the 65% it did not own by taking Talen private in 2016.[36]

Talen Montana currently owns and operates two coal-fired power plants in Montana.[37]  By all accounts, it is in deep financial distress.[38]  Specifically, its environmental and pension liabilities likely exceed the value of its assets.[39]  Why Talen Montana is in this predicament is hotly contested.  Plaintiffs allege Riverstone is to blame for Talen Montana's distress after taking Talen private, raiding its cash

---

[31] Compl. ¶ 72.

[32] Compl. ¶ 73.

[33] Compl. ¶ 4.

[34] Compl. ¶ 1.

[35] Compl. ¶ 3.

[36] *Id.*; Compl. ¶ 5.

[37] Compl. ¶ 42.

[38] Compl. ¶¶ 3–7.

[39] Compl. ¶¶ 112–15.

and then refusing to support Talen Montana with intercompany financing.[40] Defendants claim Talen Montana's financial distress followed the pre-Spin Distribution, a transaction Defendants characterize in the Montana litigation as a fraudulent transfer.[41]

## C. PPL's Pre-Spin Operations

PPL is a utility holding company and, prior to the Spin, it operated (through PPL Energy Supply's subsidiaries) competitive power generation facilities.[42] PPL Montana was formed by a subsidiary of PPL Energy Supply in 1998 to operate PPL's power generating assets in Montana.[43]  PPL Montana's primary assets were eleven hydroelectric facilities, a storage dam and interests in two coal power plants, known as Colstrip and Corette.[44]

After operating these facilities for over ten years, PPL made a business decision to exit the unregulated power business and began exploring a sale of its Montana assets.[45]  As a first step, on September 26, 2013, PPL agreed to sell its

---

[40] *Id.*

[41] Compl. ¶¶ 8–9.

[42] Compl. ¶ 36.

[43] Compl. ¶ 41.

[44] Compl. ¶ 42.

[45] Compl. ¶ 43.

Montana hydroelectric assets to non-party NorthWestern Corporation ("NorthWestern").[46] This agreement required PPL Montana to terminate a sale-and-leaseback arrangement for Colstrip, a move that, in turn, required PPL Montana to borrow approximately $270 million from PPL affiliates to fund the termination fees.[47]

As the sale of PPL Montana's hydroelectric assets awaited regulatory approval, PPL began to explore a spin-off of its competitive power generation business (the "Energy Supply Business"), consisting of PPL Energy Supply and its subsidiaries, including PPL Montana.[48] Riverstone played a key role in these negotiations.[49]

## D. The Spin and the Distribution

The Spin involved three basic steps. First, PPL created two new entities, Talen and Talen Energy Holdings.[50] Second, PPL transferred all of PPL Energy Supply's assets to Talen. Third, Riverstone transferred power generating assets held

---

[46] Compl. ¶ 44.

[47] Compl. ¶ 45.

[48] Compl. ¶ 47.

[49] Compl. ¶ 48.

[50] Compl. ¶ 49.

by Raven, Jade and Sapphire to Talen.[51]  As consideration for these asset transfers, PPL stockholders received 65% of Talen's stock while Riverstone took the other 35%, making Riverstone Talen's largest individual stockholder.[52]  PPL Montana was one of approximately 50 PPL entities transferred to Talen in the Spin.[53]

PPL, PPL Energy Supply, Talen, Talen Energy Holdings, Raven, Jade and Sapphire memorialized the terms of the Spin in a Transaction Agreement and Separation Agreement, both dated June 9, 2014.[54]  The transaction did not close until nearly a year later, on June 1, 2015.[55]  Riverstone obtained three seats on Talen's eight-seat board of directors, and Plaintiffs, Farr, Bernthal, Cox, Goeser and Graham, left their jobs at PPL to fill the other five seats.[56]  It is not disputed that Talen was solvent when the Spin was completed.[57]

PPL Montana's sale of its hydroelectric assets to NorthWestern closed on November 17, 2014, after the Spin-related documents were executed but before the

---

[51] Compl. ¶ 50.

[52] *Id.*; Compl. ¶ 76.

[53] Compl. ¶ 56.

[54] Compl. ¶ 54.

[55] Compl. ¶ 76.

[56] Compl. ¶¶ 77, 79.

[57] Compl. ¶ 85.

transaction closed.[58]   The final price paid by NorthWestern was $904 million.[59]

PPL used $170 million of the sale proceeds to repay the loan that funded the termination of the Colstrip sale-and-leaseback arrangement.[60]   The remaining $734 million of the proceeds were distributed to other PPL entities.[61]   This left PPL Montana with Colstrip and Corette as its primary assets.[62]

### E. The Separation Agreement

The Separation Agreement addressed the distribution of assets and liabilities between PPL and the newly created Talen.[63]   By its terms, the Separation Agreement split the Spin-related assets and liabilities into two categories: "Energy Supply Assets and Liabilities" and "Excluded Assets and Liabilities."[64]   Talen was to receive all Energy Supply Assets and was responsible for all Energy Supply Liabilities.[65]

---

[58] Compl. ¶ 72.

[59] *Id.*

[60] Compl. ¶ 73.

[61] *Id.*

[62] Compl. ¶ 42.

[63] Compl. ¶ 59; *see* Compl. Ex. A.

[64] Compl. Ex. A, at §§ 2.02–2.03.

[65] Compl. ¶ 57.

PPL was to keep all Excluded Assets and was responsible for all Excluded Liabilities.[66]

The Energy Supply Assets and Liabilities include the assets and liabilities of PPL Montana.[67] These consist of, among other things, Colstrip and Corette as assets, and pension and environmental obligations as liabilities.[68] The Excluded Assets and Liabilities relevant to the parties' dispute are the proceeds of the hydroelectric sale to NorthWestern that funded the Distribution.[69]

The Separation Agreement is a complex document with multiple references to schedules, the Transaction Agreement and cross-references to other sections of the Separation Agreement. Without playing the song's every note, in relevant part, the Separation Agreement provides that PPL will keep the proceeds of the asset sale to NorthWestern and, if for some reason that transaction did not close, the hydroelectric assets were to be retained by PPL.[70] Consequently, PPL also retained any liabilities arising from the sale.[71] The parties also agreed to mutual

---

[66] Compl. ¶ 62.

[67] Compl. ¶ 60.

[68] Compl. ¶¶ 60–61.

[69] Compl. ¶ 64.

[70] *Id.*

[71] Compl. ¶ 62.

12

indemnification.[72] Specifically, Talen agreed to indemnify PPL, PPL's subsidiaries and all of PPL's past and present directors and officers for "any and all Losses that result from, relate to or arise out of . . . any Energy Supply Liability."[73] PPL, in turn, agreed to indemnify Talen for "any and all Losses that result from, relate to or arise out of . . . any Excluded Liability."[74] Relatedly, the parties agreed to a release of claims and a covenant not to sue.[75] Finally, the parties agreed to a provision that allowed Talen to request additional Energy Supply Assets from PPL, within 18 months of closing, if Talen believed additional assets would be necessary to support post-Spin operations.[76]

Of particular relevance here, the Separation Agreement contains a forum selection clause choosing the Delaware Court of Chancery as the exclusive forum for disputes arising under the Agreement:

> [E]ach of the Parties irrevocably and unconditionally agrees that any Action with respect to this Agreement and the rights and obligations arising hereunder . . . brought by any Party or Parties or their respective successors or assigns, shall be brought and determined exclusively in the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware . . . . Each of the Parties hereby

---

[72] Compl. Ex. A, at §§ 5.01–5.02

[73] Compl. ¶ 65.

[74] Compl. Ex. A, at § 5.02.

[75] Compl. ¶¶ 181–82.

[76] Compl. ¶ 58.

irrevocably submits with regard to any such Action for itself and in respect of its property, generally and unconditionally, to the personal jurisdiction of the aforesaid courts and agrees that it will not bring any Action relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the aforesaid courts . . .[77]

The parties also chose Delaware law to govern the "construction, validity, enforcement and interpretation" of the Separation Agreement.[78]

## F. Riverstone Takes Talen Private

On December 3, 2015, Michael Hoffman, a Riverstone partner and member of Talen's Board, contacted Graham, then the Chairman of Talen's Board, to express Riverstone's interest in acquiring the 65% of Talen it did not already own.[79] Riverstone engaged advisors and hired counsel to assist in the sale process and, on June 2, 2016, the parties executed an agreement in principle to take Talen private.[80] There was no mention of financial distress at any of Talen's subsidiaries in the documents executed or filed in connection with the transaction, in Riverstone's public statements regarding the transaction or in communications between Talen and

---

[77] Compl. ¶ 71.

[78] Compl. Ex. A, at § 10.03.

[79] Compl. ¶ 89.

[80] Compl. ¶¶ 90–91.

14

PPL about the transaction.[81]  In fact, PPL cooperated with Riverstone throughout the sales process.[82]  Riverstone completed the take private transaction in December 2016, ending Farr, Bernthal, Cox, Goeser and Graham's affiliations with Talen.[83]  Approximately a year after the take-private transaction closed, Riverstone declared a "special cash dividend" for itself and sent $500 million from Talen Energy Supply and its subsidiaries upstream to Riverstone.[84]  In 2018, Riverstone publicly represented that Talen had the capacity to provide it with an additional $1 billion in dividends.[85]

## G. The Montana Actions

In June 2018, at Talen's request, PPL's CEO and General Counsel met with their counterparts at Talen along with Ralph Alexander, a Riverstone board designee.[86]  The Talen executives informed PPL that Riverstone intended to remove an additional $500 million from Talen and then seek to hold PPL liable for the

[81] Compl. ¶¶ 92–98.

[82] Compl. ¶ 98.

[83] Compl. ¶ 99.

[84] Compl. ¶ 102.

[85] Compl. ¶ 104.

[86] Compl. ¶ 107.

Distribution.[87]  This was the first time Riverstone or Talen had informed PPL there were potential legal issues arising from the Distribution.[88]  While claiming that Talen Montana was (and had for some time been) insolvent, Talen never sought to exercise its right under the Separation Agreement to demand that PPL contribute additional assets to Talen.[89]

Three months later, in October 2018, PPL was named as a defendant in two lawsuits in Montana.[90]  The first was filed in Rosebud County by a putative class of Talen Montana creditors (the "Rosebud Action");[91] the second was filed in Lewis and Clark County by Talen Montana ("the L&C Action").[92]  The Rosebud Action asserts eight claims against PPL, certain of its subsidiaries and certain present and former PPL directors; the L&C Action asserts eleven claims against the same

---

[87] *Id.*

[88] *Id.*

[89] Compl. ¶ 108.

[90] Compl. ¶ 109.

[91] Compl. ¶ 120.

[92] Compl. ¶ 118.  I refer to the Rosebud Action and L&C Action together as "the Montana Actions."

parties.[93] While not named as a plaintiff in either of the Montana Actions, Plaintiffs allege Riverstone caused its controlled entities to file both actions.[94]

The gravamen of the Montana Actions is that the Distribution caused PPL Montana to become insolvent and, as such, was a fraudulent transfer.[95] Plaintiffs here allege the Montana Actions are nothing more than an attempt by Riverstone to hold PPL responsible for liabilities expressly assumed by Talen in the Spin, and that the focus on the Distribution in Montana is simply a smoke screen intended to distract attention from the clear allocation of assets and liabilities memorialized in the Separation Agreement.[96]

The Rosebud Action has been removed to federal court and is currently pending in the United States District Court for the District of Montana.[97] Plaintiffs here have moved to dismiss that action, and will move to dismiss the L&C Action shortly for lack of personal jurisdiction and *forum non conveniens*.[98]

---

[93] Compl. ¶¶ 118–22.

[94] Compl. ¶ 109.

[95] Compl. ¶¶ 118–22.

[96] Compl. ¶¶ 114–24.

[97] Compl. ¶ 120.

[98] Compl. ¶ 125.

## H. Procedural History

Plaintiffs filed their Verified Complaint on November 30, 2018, and filed the First Amended Complaint on January 11, 2019. Defendants moved to dismiss. Plaintiffs then sought, and were granted, leave to file a Second Amended Complaint. The Second Amended Complaint, which is the operative complaint, was filed on March 20, 2019, and Defendants moved to dismiss on April 19, 2019.

The Second Amended Complaint comprises nine counts: (I) a claim for breach of the Separation Agreement against Talen, Talen Energy Holdings and Talen Energy Supply for causing the Montana Actions to be filed in violation of the forum selection clause; (II) a claim for declaratory relief that all Defendants cannot recover the proceeds from PPL Montana's sale of the hydroelectric assets; (III) a claim for declaratory relief against Talen Montana that Plaintiffs did not breach any fiduciary duties owed to PPL Montana and that claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty are time-barred; (IV) a claim for declaratory relief against Talen Montana that Farr, Wilten and Simonich are not liable for any alleged breach of PPL Montana's LLC Agreement, the implied covenant of good faith and fair dealing associated with that agreement or any other breach of contract, and that any claims of breach are time-barred; (V) a claim for declaratory relief against Talen Montana that Plaintiffs are not liable for tortious interference, negligent misrepresentation, constructive fraud, deceit, unjust enrichment,

18

constructive trust or punitive damages; (VI) a claim for breach of the Separation Agreement against Talen, Talen Energy Holdings, Talen Energy Supply, Talen Montana, Raven, Jade and Sapphire for failure to indemnify Plaintiffs and violating the Separation Agreement's release clauses in connection with the Montana Actions; (VII) a claim for breach of the implied covenant of good faith and fair dealing against Talen, Talen Energy Holdings, Talen Energy Supply, Raven, Jade and Sapphire for rendering Talen Montana insolvent and filing the Montana Actions; (VIII) a claim for tortious interference against Riverstone for causing entities it controls to breach the Separation Agreement; and (IX) a claim for declaratory relief that PPL is not required to indemnify the Defendants for this Delaware action.[99]

The Talen Defendants have moved to dismiss or stay Counts II–V under *McWane* for improper venue pursuant to Court of Chancery Rule 12(b)(3), and Counts I, VI–VII and IX for failure to state a claim under Court of Chancery Rule 12(b)(6).[100] The Riverstone Defendants have moved to dismiss Count VIII for failure to state a claim under Court of Chancery Rule 12(b)(6).

---

[99] Compl. ¶¶ 126–205.

[100] The Talen Defendants move to dismiss Count I (stating a claim for breach of the forum selection clause) under Rule 12(b)(6) but their arguments implicate a venue analysis under *McWane* and Rule 12(b)(3). Accordingly, I analyze the arguments under both rules.

## II. ANALYSIS

Under *McWane*, this Court will stay or dismiss a case in deference to a first-filed case in a different jurisdiction under Court of Chancery Rule 12(b)(3) if the prior action involves the same parties, the same issues and is pending in a court capable of doing prompt and complete justice.[101] A valid forum selection clause, however, can preempt application of the *McWane* doctrine.[102] While Defendants have addressed their Rule 12(b)(3) motion only to certain counts of the Complaint, they have suggested in briefing that this Delaware litigation should be stayed in its entirety in favor of the Montana Actions. Accordingly, I address the forum issues first before turning to the viability of Plaintiffs' claims as pled.

### A. The Motion to Dismiss Counts I and II–V Under *McWane*

It is undisputed the Separation Agreement contains a forum selection clause selecting the Delaware Court of Chancery as the exclusive venue for all disputes among the parties "with respect to this Agreement and the rights and obligations arising hereunder, or for recognition and enforcement of any judgment in respect of this Agreement and the rights and obligations arising hereunder."[103] The parties

---

[101] *McWane*, 263 A.2d at 283.

[102] *Ingres Corp. v. CA, Inc.*, 8 A.3d 1143, 1145 (Del. 2010).

[103] Compl. ¶ 132; Compl. Ex. A, at 52; Talen Parties' Opening Br. in Supp. of Their Mot. to Dismiss or Stay Second Am. and Supplemental Verified Compl. ("Talen OB") at 24.

further agreed they would "not bring any Action relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the [Court of Chancery]."[104]  Forum selection clauses like this are presumptively valid and vigorously enforced in Delaware.[105]

Much of the analysis this Court usually undertakes when analyzing a forum selection clause is unnecessary here because Defendants do not contest the validity or breadth of the clause in the Separation Agreement.[106]  Instead, they argue the Montana plaintiffs are non-signatories to the Separation Agreement and, therefore, are not bound by the forum selection provision.[107]  This argument elides Delaware law and ignores Plaintiffs' well-pled allegations.

The forum separation provision at issue is, by any measure, broad.[108]  Broad forum selection clauses "apply not only to claims dealing directly with the terms of the contract itself, but also to any issues that touch on contract rights or contract

---

[104] Compl. Ex. A, at §10.04.

[105] *Capital Gp. Cos., Inc. v. Armour*, 2004 WL 2521295, at *6 (Del. Ch. Nov. 3, 2004).

[106] The Talen Parties' Reply Br. in Supp. of Their Mot. to Dismiss the Second Am. and Supplemental Verified Compl. ("Talen RB") at 7.

[107] Talen OB 26.

[108] *See ASDC Hldgs., LLC v. Richard J. Malouf 2008 All Smiles Grantor Retained Annuity Trust*, 2011 WL 4552508, at *5 (Del. Ch. Sept. 14, 2011).  The forum selection clause in the Separation Agreement captures claims "with respect to" the parties' "rights and obligations" "arising" under the agreement.  Compl. Ex. A, at § 10.04.

performance."[109]  That the parties negotiated a broad forum selection clause is relevant to the question of whether the parties intended the clause to apply to non-signatories.[110]

The doctrine of equitable estoppel "prevents a non-signatory to a contract from embracing the contract, and then turning her back on the portions of the contract, such as a forum selection clause, that she finds distasteful."[111]  This court conducts a three-part inquiry to determine if equitable estoppel binds non-parties to a forum selection clause: (1) is the clause valid?; (2) are the defendants third-party beneficiaries or closely related to the contract?; and (3) does the claim arise from defendants standing relating to the agreement?[112]

Defendants only contest the third factor, arguing the Montana Actions do not arise from or relate to the Separation Agreement.[113]  Specifically, they argue the Montana Actions assert common law, statutory and contractual claims that are not

---

[109] *ASDC*, 2011 WL 4552508, at *5 (quotations omitted).

[110] *See Weygandt v. Weco, LLC*, 2009 WL 1351808, at *4 n.15 (Del. Ch. May 14, 2009) (Strine, V.C.).  In *Weygandt,* the court held that in order for non-signatories to be bound, their claims must "arise from" the operative agreement.  This analysis tracks the analysis the court undertakes when determining the extent to which certain claims are captured by a forum selection clause. *See ASDC*, 2011 WL 4552508, at *5.

[111] *Armour*, 2004 WL 2521295, at *6.

[112] *Weygandt*, 2009 WL 1351808, at *4.

[113] Oral Arg. on Defs.' Mots. to Dismiss ("OA") at 25.

dependent on the existence of the Separation Agreement.[114]   According to Defendants, the Montana plaintiffs are not attempting to enforce the Separation Agreement nor are they seeking any benefits from it.[115]   While this may be true, Defendants choose to ignore that, if the Montana Actions proceed, the Montana defendants undoubtedly will point to and rely upon the Separation Agreement as their first and principal line of defense.[116]   While all roads may not lead to Rome, all litigation roads these parties might travel, both in Delaware and Montana, invariably will lead back to the Separation Agreement.

Additionally, Plaintiffs have well-pled that Riverstone caused entities over which it exercised control to file the Montana Actions, in part, to attempt to avoid the Delaware forum selection clause.[117]   If Plaintiffs prove this to be true, it would be inequitable not to enforce the contractually bargained for forum selection clause

---

[114] Talen RB 12.

[115] Talen OB 30.

[116] To state the obvious, the Montana defendants will argue that, under the Separation Agreement, they can have no liability for Energy Supply Liabilities or for so-called "Missing Assets," are fully indemnified for such claims and, in any event, the Montana plaintiffs have contractually waived their right to prosecute such claims. Compl. ¶¶ 41–60. Defendants acknowledged as much at oral argument. (The Court: "you are looking for some sort of declaration of what all this means in the Separation Agreement here in Delaware that can then be used in some sort of preclusive way in Montana?" Defendants' counsel: "That's the way it's been set up through this motion.") OA at 18. Of course, whether *vel non* these defenses have merit remains to be seen.

[117] Compl. ¶¶ 109, 121, 134–39.

simply because Riverstone caused the Montana Actions to be filed by nonparties to that contract. This Court does not countenance such tactics when they are employed to defeat bargained-for rights.[118]

Because the Separation Agreement's forum selection clause captures the claims brought in the Montana Actions, there is no need to engage in a *McWane* analysis.[119] Defendants' Motion to Dismiss or Stay Counts I and II–V is denied. As bound parties, Plaintiffs have well-pled that Defendants breached the Separation Agreement by causing the Montana Actions to be filed. Thus, Defendants' Motion to Dismiss Count I must be denied as well.

## B. The Motion to Dismiss Counts I, VI, VII & IX Under Rule 12(b)(6)[120]

The standard for deciding a Motion to Dismiss under Court of Chancery Rule 12(b)(6) is well-settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences

---

[118] *See Ashall Homes*, 992 A.2d at 1252 (refusing to allow "artful pleading" to circumvent a forum selection clause); *Neurvana Med., LLC v. Balt USA, LLC*, 2019 WL 4464268, at \*5 (Del. Ch. Sept. 18, 2019) (noting "it would be inconsistent with [public] policy to allow the entities through which one of the parties chooses to act to escape the forum selection clause" (quoting *Weygandt*, 2009 WL 1351808, at \*5)).

[119] *Ingres*, 8 A.3d at 1145.

[120] Having determined that Plaintiffs have properly invoked the forum selection clause, it follows they have stated a viable claim of breach of that clause by virtue of the filing of the Montana Actions. Accordingly, I need not analyze the Rule 12(b)(6) motion as to Count I any further.

in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[121]

Because this case presents legal issues surrounding the "proper interpretation of language in a contract,"[122] the Court may address these issues at the motion to dismiss stage "[w]hen the language of [the] contract is plain and unambiguous."[123] Contract language is ambiguous "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[124] Dismissal is appropriate when the defendant's interpretation is the only reasonable construction as a matter of law; if the plaintiff has proffered a reasonable construction upon which its claim of breach rests, the motion to dismiss must be denied.[125]

Count VI alleges breaches of express provisions of the Separation Agreement; Count VII alleges a breach of the implied covenant of good faith and fair dealing; and Count IX seeks a declaratory judgment that PPL is not obligated to indemnify

---

[121] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citation omitted).

[122] *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006) (Strine, V.C.) (noting that issues of contract interpretation present questions of law).

[123] *Id.*

[124] *AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008) (quotations omitted).

[125] *Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine P'rs 2006, L.P.*, 93 A.3d 1203, 1205 (Del. 2014); *Kahn v. Portnoy*, 2008 WL 5197164, at *1 (Del. Ch. Dec. 11, 2008).

the Defendants for this action. Each claim turns on the construction of the Separation Agreement's definition of "Energy Supply Liabilities" and "Excluded Liabilities."[126] Accordingly, it is appropriate to begin the analysis there. I begin by considering the parties' competing construction of these terms and then address the viability of Plaintiffs' breach of contract, breach of the implied covenant and declaratory judgment claims.

### 1. Energy Supply Liabilities vs. Excluded Liabilities

Delaware law governs the Separation Agreement. And, "under Delaware law, courts interpret contracts to mean what they objectively say"[127] with a purpose of "satisfying the 'reasonable expectations of the parties at the time they entered into the contract.'"[128] Our courts construe contracts "as a whole, giving effect to all provisions therein."[129] "The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan."[130]

---

[126] *See* Talen OB 33–55.

[127] *Plaze, Inc. v. Callas*, 2019 WL 1028110, at *4 (Del. Ch. Feb. 28, 2019) (quotations omitted).

[128] *Dittrick v. Chalfant*, 948 A.2d 400, 406 (Del. Ch. 2007) (quoting *The Liquor Exchange, Inc. v. Tsaganos*, 2004 WL 2694912, at *2 (Del. Ch. Nov. 16, 2004)).

[129] *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 55 A.3d 330, 334 (Del. 2012) (quotations omitted).

[130] *GMG Capital Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012).

As noted, the Separation Agreement provides that assets and liabilities subject to the Spin would be characterized either as "Energy Supply" or "Excluded."[131] Plaintiffs argue the Montana plaintiffs have brought claims based on liabilities that Talen expressly assumed and agreed to indemnify the PPL parties for in the Separation Agreement.[132] Defendants counter that they are suing on liabilities specifically retained by PPL in the Separation Agreement, and because their claims relate to "Excluded Liabilities," the Separation Agreement's indemnification, release of claims and "Missing Assets" provisions do not apply.[133]

As noted, Talen agreed to assume all liabilities related to the Energy Supply Business, specifically promising to "assume, perform, discharge and fulfill when due and, to the extent applicable, comply with, such Energy Supply Liabilities in accordance with their respective terms."[134] Energy Supply Liabilities are defined as "all Liabilities of [PPL] . . . arising out of, relating to or produced from the operation or conduct of the Energy Supply Assets or . . . the operation or conduct of the Energy Supply Business . . . ."[135] In short, under this construction, any liability (except for

---

[131] Compl. ¶¶ 57–64.

[132] Compl. ¶¶ 61–69.

[133] Talen OB 36–41.

[134] Compl. Ex. A, at § 1.01(g).

[135] Compl. Ex. A, at § 2.03(a).

Excluded Liabilities) of PPL Energy Supply prior to the Spin would be assumed by the newly created Talen. Consequently, all of PPL Montana's liabilities would be transferred to Talen Montana after the Spin. Defendants do not dispute that this would capture PPL Montana's environmental liabilities and unfunded pension obligations.[136]

The Separation Agreement specifically carves out certain assets and liabilities as "Excluded." This includes the proceeds of the hydroelectric sale to NorthWestern. To define "Excluded Assets," the Separation Agreement points to "the Assets listed or described on Schedule 2.02(b)(ix) . . . ."[137] The second item listed in that schedule is "[a]ll proceeds payable to Energy Supply Sub pursuant to that certain Purchase and Sale Agreement dated September 29, 2013 between PPL Montana, LLC and NorthWestern Corporation. . . ."[138] Section 2.03(b)(ii) of the Separation Agreement defines "Excluded Liabilities" as "any Liability of Parent and/or any of its Affiliates to the extent arising out of or relating to any Excluded Asset, or any other Asset of Parent or any of its Affiliates that is not an Energy Supply Asset. . . ."[139] Therefore, under a reasonable construction of the relevant

---

[136] *See* OA at 11–15.

[137] Compl. Ex. A, at § 2.02(a).

[138] Compl. Ex. C, at 1.

[139] Compl. Ex A, at § 2.03(b).

language, the proceeds from the sale of PPL Montana's hydroelectric assets are Excluded Assets and any liabilities arising from or relating to those assets are Excluded Liabilities.

Defendants say the contract construction exercise can end here. Specifically, they argue that, because their claims in Montana relate to the Distribution, the unambiguous language of the contract renders the liabilities giving rise to those claims Excluded Liabilities.[140] But this stops the analysis halfway. In their fraudulent transfer claim, the "liability" the Montana plaintiffs say is "Excluded" is the Distribution that caused Talen Montana's insolvency.[141] In this regard, the Montana plaintiffs (and Defendants here) attempt a "but for" argument: but for PPL Montana sending the proceeds of the hydroelectric sale upstream to PPL, Talen Montana would have sufficient funds to pay its debts.[142] Framing the claim

---

[140] Talen OB 37–39.

[141] Compl. ¶ 7. The Montana Actions allege insolvency "under all three solvency tests— balance sheet insolvency, inability to pay debts when due, and unreasonably small capital . . . ." Talen OB Ex. A, at 15. *See generally, Insolvency*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("[t]he condition of being unable to pay debts as they fall due . . . when the debtor's liabilities exceed its assets.").

[142] *See* Talen RB 21 ("Every claim in the Montana Actions seeks redress for the harm caused by the PPL Parties' scheme to strip Talen Montana of its value and render it insolvent by causing the sale of hydroelectric assets and Distribution of the sale proceeds."). As Plaintiffs point out, while it is certainly true the money sent upstream to PPL in the Distribution could have covered at least some portion of these debts, the same could be said of the billions of dollars that allegedly have flowed in and out of Talen since the Spin (Plaintiffs specifically point to $1.2 billion spent by Talen to buy MACH Gen, LLC, and a $500 million special dividend declared and received by Riverstone as

29

this way exposes the inherent connection of the claim to the Separation Agreement; the alleged insolvency exists because Talen Montana allegedly cannot pay its debts, specifically its underlying environmental and pension obligations.[143] These debts arise separately from and predate the Distribution. Thus, there is reason under the Separation Agreement to conclude that Talen expressly assumed these liabilities as Energy Supply Liabilities.[144] As pled in the Complaint, it is reasonably conceivable that Defendants' attempt to characterize the "liabilities" at issue as arising solely from the Distribution is actually an effort to circumvent the Separation Agreement's bargained for allocation of risk.[145]

Riverstone negotiated the Spin with the assistance of experienced counsel on a clear day. The parties conducted extensive diligence before executing the deal and the Separation Agreement expressly recognizes that the newly created Talen had no claim to the proceeds of the hydroelectric sale.[146] As pled, all the parties were aware

---

examples). Compl. ¶¶ 82, 102. And, while Talen was not obliged under the Separation Agreement to provide Talen Montana with intercompany financing, it is undisputed that Talen, as a whole, was solvent prior to the take-private transaction and had the ability to provide some funding to Talen Montana. Talen OB 10.

[143] *See* Talen OB Ex. A, at 14–15.

[144] *See* Compl. Ex. A, at § 2.03(a).

[145] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) (holding that Delaware courts may not "rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal.").

[146] Compl. ¶¶ 10–12, 64.

of the Distribution and nothing in the Separation Agreement indicates any party took issue with it.[147] Moreover, Talen expressly assumed PPL Montana's liabilities and Riverstone presumably was aware how PPL had supported its subsidiary through intercompany financing and how a decline in the wholesale energy market could threaten the newly-created Talen Montana's solvency.[148] These pled facts support Plaintiffs' construction of the operative provisions of the Separation Agreement. Whether Plaintiffs' is the only reasonable construction of the contract is a question not called by the motion *sub judice*. Suffice it to say, Plaintiffs have proffered a reasonable construction and, as discussed below, their construction supports their claims for breach of contract and declaratory judgment.

## 2. Plaintiffs Have Stated Viable Breach of Contract and Declaratory Judgment Claims

To state a claim for breach of contract, a plaintiff must plead: (1) the existence of a contract; (2) the breach of a contractual obligation; and (3) damage to the plaintiff.[149] Having determined that Plaintiffs have proffered a reasonable construction of the Separation Agreement that supports their claim that the liabilities in the Montana Actions are Energy Supply Liabilities, it follows they have stated a

---

[147] Compl. ¶ 107.

[148] Compl. ¶¶ 112–15.

[149] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 883 (Del. Ch. 2009).

31

viable claim that the filing of the Montana Actions constitutes a material breach of the Separation Agreement by violating the agreement's indemnification and antisuit provisions. Accordingly, the Talen Defendants' Motion to Dismiss Count VI must be denied.[150] And because the liabilities of Talen Montana are conceivably Energy Supply Liabilities such that Defendants would not be entitled to indemnification for defending this action, Defendants' Motion to Dismiss Count IX must also be denied.

### 3. Plaintiffs Have Failed to State a Viable Implied Covenant Claim

Along with their express breach of contract claims, Plaintiffs allege Defendants have breached the implied covenant of good faith and fair dealing.[151] Specifically, they allege Talen's failure to support Talen Montana with intercompany financing and the Talen controlled entities' act of filing the Montana Actions both breach the implied covenant.[152] As explained below, these claims fail as a matter of law.

---

[150] Defendants' arguments about the inapplicability of the indemnification, waiver of claims, antisuit and "Missing Assets" provisions of the Separation Agreement all rest on their construction of the language concerning Energy Supply and Excluded liabilities. Talen OB 36–41. While that construction may ultimately prevail, the Court's determination that Plaintiffs' have proffered a reasonable construction that would place the claims in the Montana Actions within the definition of Energy Supply Liabilities precludes dismissal of claims alleging those provisions have been breached.

[151] Compl. ¶¶ 187–93.

[152] *Id.*

The implied covenant of good faith and fair dealing "attaches to every contract."[153]  But our courts appreciate that "the implied covenant is a cautious enterprise" that should not be invoked imperiously.[154]  Delaware implies terms within a contract only when there is a gap in a contract that the parties would have covered with additional covenants had they thought to do so.[155]  It is not surprising, then, that "Delaware courts rightly employ the implied covenant sparingly when parties have crafted detailed, complex agreements, lest parties be stuck by judicial error with duties they never voluntarily accepted."[156]

Plaintiffs have failed to identify the contractual "gap" in the Separation Agreement the implied covenant must fill.  Although the Separation Agreement is silent regarding Talen's obligation to provide intercompany support to Talen Montana, mere silence does not a contractual gap make.[157]  "The most obvious reason a term would not appear in the parties' express agreement is that the parties simply rejected that term *ex ante* when they articulated their contractual rights and

---

[153] *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005).

[154] *Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 506–07 (Del. 2019); *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009).

[155] *Nemec*, 991 A.2d at 1125.

[156] *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *7 (Del. Ch. Apr. 20, 2009) (Strine, V.C.).

[157] *Nemec*, 991 A.2d at 1125.

33

obligations."[158]    The Separation Agreement thoroughly details each party's obligations and there is no indication the parties bargained for, or even contemplated, a post-closing duty for Talen to provide financing support to Talen Montana.  Had the parties intended to impose that obligation upon Talen, they would have said so in the Spin documents.[159]

Plaintiffs argue the Defendants' construction of the Separation Agreement vests Defendants with the ability to "exercise discretion in a manner that could strip [Plaintiffs] of the benefits of the agreement."[160]  "Discretion" in the implied covenant context does not exist wherever a party to the contract has some decision-making flexibility; it only exists "in contracts that defer a decision at the time of contracting and empower one party to make that decision later."[161]  Plaintiffs have failed to address exactly what that discretion is here, other than the obvious power Talen has

---

[158] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 183 (Del. Ch. 2014) (quoting Mohsen Manesh, *Express Contract Terms and the Implied Contractual Covenant of Delaware Law*, 38 DEL. J. CORP. L. 1, 19 (2013)).

[159] Additionally, as Defendants note, the Spin documents do address other post-closing matters.  Talen OB 44–45.  Although none concern intercompany financing, the fact that some post-closing matters were bargained for, but not intercompany financing, strengthens the argument that the parties did not intend for there to be any contractual obligation for Talen to provide post-Spin financing to Talen Montana.

[160] Pls.' Answering Br. in Opp'n to Defs.' Mots. to Dismiss the Second Am. and Supplemental Verified Compl. ("AB") 54 (citing *Amirsaleh v. Bd. of Trade of City of New York, Inc.*, 2008 WL 4182998, at *8 (Del. Ch. Sept. 11, 2008)).

[161] *Amirsaleh*, 2008 WL 4182998, at *8.

to control its subsidiaries.[162]  Our case law is clear the discretion required to invoke the implied covenant is narrower and more definite than Plaintiffs have proffered here.[163]

Plaintiffs also attempt an argument that, in essence, grounds the alleged breach of the implied covenant in Defendants' alleged breaches of the express terms of the Separation Agreement.[164]  Of course, that is not how the implied covenant works.  If Plaintiffs have a claim for breach of contract, they should state it as such.  There is no room or need for the implied covenant.[165]  Count VII must be dismissed.

---

[162] AB 55 ("This would give Defendants the discretion to operate the Talen entities in a bad faith manner and then shift their post-Spin liabilities to PPL.").

[163] *See Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 637 (Del. Ch. 2011) (Strine, C.) (dismissing an implied covenant claim alleging an acquiring company had a duty to run the acquired company in a manner that maximized payouts to shareholders), *aff'd*, *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013);  *Amirsaleh*, 2008 WL 4182998, at *8–9 (denying summary judgment of an implied covenant claim in a contract which contained explicit discretion granting language); *Emery Bay*, 2009 WL 1124451, at *7 (denying Motion to Dismiss of an implied covenant claim where a party was expressly vested with discretion to cause agreements to be performed); *Miller v. HCP & Co.*, 2018 WL 656378, at *10–11 (Del. Ch. Feb. 1, 2018) (dismissing implied covenant claim where scope of discretion was specified).

[164] AB 55–57.

[165] *See Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008) ("because the implied covenant is, by definition, *implied*, and because it protects the *spirit* of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue.").

## C. Plaintiffs Have Stated a Viable Tortious Interference Claim Against Riverstone

Plaintiffs allege Riverstone tortiously interfered with the Separation Agreement by intentionally rendering Talen Montana insolvent and subsequently causing the Montana Actions to be filed.[166] Riverstone accepts as true Plaintiffs' allegations for now and rests its motion to dismiss on the lack of an underlying contractual breach, or in the alternative, the affiliate privilege.[167] As I have declined to dismiss Plaintiffs' breach of contract claims, I turn directly to Riverstone's affiliate privilege defense.

The elements of tortious interference are "(1) a contract, (2) about which defendant knew, *and* (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury."[168] The so-called "affiliate privilege" is a qualified privilege in the intentional interference realm that protects a parent company's ability to engage in legitimate business activities with its subsidiaries.[169] If the privilege applies, the plaintiff will not be able to prove a *prima facie* element of the tort of intentional interference—that the

---

[166] Compl. ¶ 197.

[167] The Riverstone Defs.' Br. in Supp. of Their Mot. to Dismiss the Second Am. and Supplemental Verified Compl. ("Riverstone OB") 2 n.1, 4–5.

[168] *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013).

[169] *Shearin v. E.F. Hutton Gp., Inc.*, 652 A.2d 578, 591 (Del. Ch. 1994) (Allen, C.).

parent's alleged interference with its subsidiary's contract was "without justification."

"[T]he test for holding a parent corporation liable for tortious interference ha[s] to be high or every-day consultation or direction between parent corporations and subsidiaries about contractual implementation would lead parents to be always brought into breach of contract cases."[170]  In *Shearin v. E.F. Hutton Group, Inc.*, Chancellor Allen described how a plaintiff must plead the interfering party acted in bad faith to overcome the privilege:

> [T]he gist of a well-pleaded complaint for interference by a corporation of a contract of its affiliate is a claim that the "interfering" party was not pursuing in good faith the legitimate profit seeking activities of the affiliated enterprises.  If one is privileged by reason of a recognized relationship to discuss the financial welfare of an affiliated party, one may in good faith suggest that a termination of a contract, and the assumption of any resulting liability, would be beneficial to that party.[171]

The bad faith standard is "stringent" and will not be found where a parent was merely advising or causing the subsidiary to engage in an efficient breach of the contract.[172]

Plaintiffs' allegations that Riverstone intentionally caused its subsidiaries to render Talen Montana insolvent and to file the Montana Actions are sufficient to

---

[170] *Allied Capital*, 910 A.2d at 1039.

[171] *Shearin*, 652 A.2d at 591.

[172] *Allied Capital*, 910 A.2d at 1039; *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *30 (Del. Ch. Nov. 17, 2014).

allege bad faith and overcome the privilege.[173]  In this regard, then-Vice Chancellor

Strine's decision in *Allied Capital v. GC-Sun Holdings, L.P.* is instructive.[174]

In *Allied Capital*, a company engaged in a series of transactions with its subsidiaries

by which a note holder's priority, and ultimate financial return, was dramatically

reduced.[175]  The court noted, "this case does not involve the classic efficient breach

scenario that underlies the limited privilege in the tortious interference context[,]"

and emphasized that "[parent] is alleged to have purposely injured [subsidiaries] so

as to enable [parent's] newly-created affiliate [company] to reap gain."[176]

Plaintiffs have also sufficiently pled this is not a "classic efficient breach

scenario" and that Riverstone purposefully damaged its subsidiary, Talen Montana,

in order to orchestrate this lawsuit as a means to achieve a cash recovery from

Plaintiffs.[177]  As in *Allied Capital*, it is well-pled here that Riverstone "use[d] its

control of a subsidiary, not to enrich the subsidiary, but to divert value from the

---

[173] Compl. ¶¶ 197–98.

[174] *Allied Capital*, 910 A.2d at 1040.  Although the court dismissed the tortious interference claim because there was no underlying breach of contract, in discussing a claim of civil conspiracy among business entities under common control, the court specifically noted, "[i]n this case, there is no doubt that the complaint pleads facts that satisfy . . . the bad faith standard articulated in *Shearin*."  *Id.*

[175] *Id.* at 1026–29.

[176] *Id.* at 1040.

[177] *Id.* at 1041; Compl. ¶¶ 197–98.

subsidiary to itself in a bad faith manner . . . ."[178]  Riverstone is not alleged to have caused Talen Montana to breach the Separation Agreement because it viewed paying damages as less costly than performance.  Rather, it is well-pled that Riverstone caused a breach because it thought it could profit from a subsequent lawsuit against the PPL parties.[179]  Whether Plaintiffs can prove those allegations remains to be seen. For now, however, the Riverstone Defendants' Motion to Dismiss Count VIII must be denied.

## III.   CONCLUSION

For the foregoing reasons, the Talen Defendants' Motion to Dismiss is **DENIED** as to Counts I–VI and Count IX, and **GRANTED** as to Count VII. Riverstone's Motion to Dismiss Count VIII is **DENIED.**

**IT IS SO ORDERED.**

---

[178] *Allied Capital*, 910 A.2d at 1042.

[179] Compl. ¶ 110.